UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

EUGENE SMITH,

                              Plaintiff,
                                                        9:15-CV-00137
v.                                                      (LEK/TWD)

P. PALMER, F. BREYETTE, M. SMITH,
J. DELISLE,

                              Defendants.
_____

APPEARANCES:                           OF COUNSEL:

EUGENE SMITH
13-A-4202
Plaintiff pro se
Sullivan Correctional Facility
Box 116
Fallsburg, New York 12733


HON. ERIC T. SCHNEIDERMAN            ADRIENNE J. KERWIN, ESQ
Attorney General for the State of New York   Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**ORDER AND REPORT AND RECOMMENDATION**</u>

I.      **INTRODUCTION**

        Pro se Plaintiff Eugene Smith is an inmate in the custody of the New York Department of

Corrections and Community Supervision ("DOCCS"), and is currently housed at Sullivan

Correctional Facility.  Plaintiff commenced this civil rights action pursuant 42 U.S.C. § 1983 on

February 9, 2015.  (Dkt. No. 1.)  The allegations in Plaintiff's amended complaint, which is the operative pleading in the case, relate to Plaintiff's previous confinement at Clinton Correctional Facility ("Clinton").  (Dkt. Nos. 12; 20 at 6.)

Plaintiff's claim for excessive force in violation of the Eighth Amendment against Clinton Corrections Officers P. Palmer ("Palmer"), F. Breyette ("Breyette"), and M. Smith ("Smith"), and his Eighth Amendment failure to intervene claim against Clinton Sergeant Delisle ("Delisle"), survived initial review pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A.  (Dkt. Nos. 10 and 20.)  Defendants have now moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that: (1) Plaintiff's deposition testimony regarding his excessive force and failure to protect claims was such that no reasonable jury could credit the allegations underlying the claims; and (2) Plaintiff has failed to exhaust his administrative remedies.  (Dkt. Nos. 32; 32-16.)  Plaintiff has opposed Defendants' motion and cross-moved for partial summary judgment on his Eighth Amendment claims.[1]  (Dkt. No. 37.) Defendants have opposed Plaintiff's cross-motion.  (Dkt. No. 38.)  For reasons explained below, the Court recommends that Defendants' motion for summary judgment be granted without prejudice solely on the ground that Plaintiff failed to exhaust his administrative remedies before

---

[1] Plaintiff's cross-motion includes a request for summary judgment on a denial of due process claim in connection with a disciplinary hearing.  (Dkt. No. 37 at ¶¶ 5, 8, 15-18.)  The only claims against Defendants alleged in Plaintiff's amended complaint identified by the Hon. Lawrence E. Kahn, United States District Judge, as surviving initial review are Plaintiff's Eighth Amendment claims.  (*See* Dkt. Nos. 12, 20.)  Claims raised for the first time in response to summary judgment may not be used as a means to amend a complaint.  *See, e.g., Fershtadt v. Verizon Comm. Inc.*, No. 07 Civ. 6963(CM), 2010 WL 571818, at * 7 (S.D.N.Y. Feb. 9, 2012) (court declined to consider unpleaded claims on plaintiff's motion for summary judgment where no motion had been made to amend the complaint and the case was at the stage where dispositive motions were pending).

commencing this action.

## II.    FACTUAL BACKGROUND

### A.    Claims of Excessive Force and Failure to Protect

On the morning of December 14, 2014, while Defendants Palmer and Breyette were involved in Plaintiff's preparations for transfer, an issue arose regarding a television that had been given to Plaintiff by another inmate. (Dkt. Nos. 12 at ¶¶ 1-5; 32-3 at 66-68.) According to Plaintiff, Palmer became impatient when Plaintiff had difficulty untying the draft bag in which he had put the television and said "Come on I don't have all fucking day, you stupid Niggers, you are all the same, you all dirty and stupid." (Dkt. Nos. 12 at ¶¶ 5, 12; 32-3 at 68.) Plaintiff claims that when he asked Palmer why he was speaking to him in that manner, Palmer out of nowhere punched Plaintiff in the face and followed with repeated blows to the head, left rib cage, and upper and lower body. (Dkt. Nos. 12 ¶ 6; 32-2 at 69-71.) Plaintiff contends that Breyette joined in the attack, striking him several times in the back, legs, and upper and lower body with his night stick. (Dkt. Nos. 12 at ¶ 6; 32-2 at 71-73.) Both officers continued punching, kicking, and kneeing Plaintiff, and he was punched directly in his left eye, which was covered with a cup dressing because of recent eye surgery. (Dkt. No. 32-2 at 79-84.) Plaintiff claims that Defendant Smith joined in the beating, viciously punching Plaintiff in the rib cage. (Dkt. Nos. 12 at ¶ 7; 32-2 at 85-87.) Delisle, who is alleged to have been present while Plaintiff was being assaulted, turned a blind eye and did nothing to prevent or stop the assault. (Dkt. No. 12 at ¶ 7.)

Palmer claims that Plaintiff became agitated about the television and stood up with clenched fists, assumed a fighting stance and began throwing punches at Palmer, which Palmer was able to avoid. (Dkt. No. 32-12 at ¶¶ 6-8.) According to Palmer, he grabbed Plaintiff with

both arms around his upper torso in a bear-hug type body hold, and Plaintiff, who continued to struggle was, with the assistance of Breyette, forced to the ground outside of his cell, face down, and placed in mechanical restraints. *Id*. at ¶ 8-9; Dkt. No. 32-13 at ¶¶ 7-9. Plaintiff then became compliant, all force ended, and Plaintiff was assisted to his feet and escorted to medical. (Dkt. Nos. 32-12 at ¶ 9; 32-13 at ¶ 10.) Palmer and Breyette contend that all of the actions taken in connection with the incident on December 14, 2014, were intended to ward off an assault initiated by Plaintiff, and the degree of force used to subdue Plaintiff was appropriate and necessary. (Dkt. Nos. 32-12 at ¶¶ 13-14; 32-13 at ¶¶ 13-14.)

Delisle denies arriving at Plaintiff's cell block until Plaintiff was standing at the front of the company in mechanical restraints and there was no ongoing altercation. (Dkt. No. 32-14 at ¶ 6.) He denies any personal involvement in Plaintiff's physical altercation with Palmer and Breyette and denies using or observing the use of excessive force in violation of Plaintiff's Eighth Amendment rights. *Id*. at ¶¶ 13, 15. Smith claims his only involvement in the December 14, 2014, incident was escorting Plaintiff to the facility hospital, where Plaintiff was pat-frisked, hand-scanned, and boss-chaired with negative results. (Dkt. No. 32-11 at ¶ 5.) Smith claims to have had no personal involvement in Plaintiff's physical interactions with Palmer and Breyette and not to have used excessive force on Plaintiff in violation of his Eighth Amendment rights. *Id*. at ¶¶ 7, 9.

Lisa Anderson ("Anderson"), a Registered Nurse at Clinton, examined Plaintiff at approximately 10:15am on December 14, 2014, following the incident, and concluded that the injuries he had sustained were minor. (Dkt. No. 32-8 at ¶¶ 1, 4, 6, 20.) According to Anderson, she found no evidence that Plaintiff had been subjected to the degree of force described in his

complaint.  *Id*. at ¶ 5.  Anderson prepared an Inmate Injury Report as an addendum to the Use of Force Report.  *Id.* at ¶ 6; Dkt. No. 33 at 1.

Anderson found that Plaintiff had an abrasion below his left eye, approximately 3/4" in length in an area covered by a post-surgical cup, with a scant amount of dried blood below his left eye.  *Id.* at ¶ 7.  Plaintiff was also found to have an abrasion to his left elbow approximately ½" in diameter with a scant amount of fresh bloody drainage.  *Id.* at ¶ 8.  Plaintiff complained of soreness through his rib cage, but Anderson found no visible injuries or bruises.  *Id.* at ¶ 9.  Anderson was unable to observe physical demonstration of the type one might typically see in an individual experiencing significant pain.  *Id*. at ¶10.  Anderson looked for and found no bruises, strike marks, or redness to Plaintiff's skin.  *Id*. at ¶ 12.

Plaintiff was taken to Champlain Valley Physicians' Hospital ("CVPH") for examination because of his recent left eye surgery.  *Id*. at ¶ 17.  Hospital records indicate that Plaintiff, who had glaucoma/cataract surgery four days prior, complained of difficulty seeing out of his left eye and of left rib pain following the incident.  (Dkt. No. 33-2 at 3.)  Plaintiff was observed to have swelling of the left face.  *Id*. at 10.  He was diagnosed with abnormal vision, injury of head, and glaucoma surgery four days ago.  *Id*. at 6.  A facial CT scan showed right frontal scalp soft tissue injury but no fracture.  *Id*. at 10, 24.  A brain CT scan showed no intra cranial acute bleeding or depressed skull fracture.  *Id*. at 11, 25.  Chest x-rays revealed a normal unilateral left rib exam.  *Id*. at 26.

Palmer issued Plaintiff a misbehavior report as a result of the December 14, 2014, incident.  (Dkt. No. 37-3 at 8.)  Plaintiff was charged with 100.11 attempted assault; 107.10 interference; 104.11 violent conduct; and 104.13 disturbance.  *Id*.  Plaintiff was found guilty on

all of the charges at a Tier III hearing and given four months in the Special Housing Unit with a corresponding loss of privileges. *Id*. at 3. The hearing officer's determination was affirmed on February 26, 2015. *Id*. at 2.

### B. Plaintiff's Grievance

Plaintiff filed Grievance No. CL-66446-1, dated December 30, 2014, arising out of the December 14, 2014, incident. (Dkt. No. 37-5 at 11-13.) The allegations in the grievance are substantially similar to those in Plaintiff's amended complaint. (*Compare* Dkt. Nos. 12 and 37-5 at 11-13.)

The grievance was denied by Clinton Superintendent Racette on January 20, 2015. (Dkt. No. 37-5 at 16.) Plaintiff contends that he filed an appeal with the Central Office Review Committee ("CORC"). (Dkt. Nos. 12 at ¶ 13; 32-3 at 59-60.) At his deposition, Plaintiff identified an original of the Superintendent's January 20, 2015, determination containing an original completed appeal statement, signed by Plaintiff and dated January 23, 2015, that he had brought with him to the deposition. (Dkt. Nos. 32-3 at 10, 58-59; 37-5 at 16.) Plaintiff testified that he had an original of the appeal statement because inmates are sent two copies (not carbon copies) of the Superintendent's determination so that they can complete the appeal statement on one and send it back. (Dkt. No. 32-3 at 60.) According to Plaintiff, he returned the appeal statement by folding it up, putting it in an envelope and putting it where it could be picked up by a corrections officer and placed in a facility mailbox. *Id*. at 61. Plaintiff testified that he witnessed an officer pick it up but was unable to identify the officer. *Id*.

Plaintiff claims he has never heard anything on his January 23, 2015, appeal to CORC. *Id*. at 59. Karen Bellamy ("Bellamy"), Director of the DOCCS Inmate Grievance Program

("IGP"), submitted a Declaration on Defendants' motion in which she has stated that she

conducted a diligent search of CORC's database of records, which by DOCCS directive includes

copies of appeals to CORC for at least the current year and four previous years, and found that

Plaintiff has not completed the Internal Grievance Resolution Committee ("IGRC") process

through CORC for any grievance. (Dkt. No. 32-15 at ¶¶ 1, 12, 14.)

### III.    APPLICABLE SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together

"show that there is no genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law." Fed.R.Civ.P. 56; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 251-52 (1986). The party moving for summary judgment bears the initial burden of

showing, through the production of admissible evidence, that no genuine issue of material fact

exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is

"genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to

produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d

at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the

[plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

"Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue

of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See*

*Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit.[2] *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "To defeat summary judgment, . . . nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id*. (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations. "*Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball*

---

[2] The Court finds that Plaintiff's amended complaint was adequately verified under 28 U.S.C. § 1746 by the language "'[p]ursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct." (Dkt. No. 12 at 10.)

*Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding pro

se, the court is obliged to "read [the pro se party's] supporting papers liberally, and . . . interpret

them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790

(2d Cir. 1994). However, "a pro se party's 'bald assertion,' unsupported by evidence, is not

sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981

(WHP) (JCF), 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999)[3] (citing *Carey v. Crescenzi*, 923

F.2d 18, 21 (2d Cir. 1991)).

When considering cross-motions for summary judgment, a court "must evaluate each

party's motion on its own merits, taking care in each instance to draw all reasonable inferences

against the party whose motion is under consideration." *Hotel Employees & Rest. Employees*

*Union, Local 100 of New York, N.Y. & Vicinity, AFL-CIO v. City of New York Dept. of Parks &*

*Recreation*, 311 F.3d 534, 543 (2d Cir. 2002) (quoting *Heublein v. United States*, 996 F.2d 1455,

1461 (2d Cir. 1993) (internal quotation marks omitted).

## IV. PLAINTIFF'S FAILURE TO COMPLY PROPERLY WITH L.R. 7.1(a)(3)

While courts are required to give due deference to a plaintiff's pro se status, that status

"does not relieve [a pro se] plaintiff of his duty to meet the requirements necessary to defeat a

motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003).

Plaintiff has failed to respond to Defendants' Statement of Material Facts as required under L.R.

7.1(a)(3).[4] (See Dkt. No. 37.) His responsive papers do not mirror the Defendants' Statement of

_____

[3] Copies of all unpublished decisions cited herein will be provided to Plaintiff in
accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[4] L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's Statement
of Material Facts. Under the rule, the response "shall mirror the movant's Statement of Material

Material Facts, do not specifically admit or deny the statements therein, and do not cite

references to record evidence supporting or refuting the Defendants' statements. *Id*. Where a

party has failed to respond to the movant's statement of material facts in the manner required

under L.R. 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent

they are supported by evidence in the record,[5] and (2) the nonmovant, if proceeding pro se, has

been specifically advised of the possible consequences of failing to respond to the motion.[6] *See*

*Champion,v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

Plaintiff has also failed to submit a Statement of Facts that complies with L.R. 7.1(a)(3)

on his cross-motion for partial summary judgment.[7] *Id*. at 5-8. Plaintiff's Material Statement of

Facts consists of factual allegations without specific citation to evidence in the record and legal

arguments. *Id.* Under L.R. 7.1(a)(3), "failure of the moving party to submit an accurate and

---

Facts by admitting and/or denying each of the movant's assertions in matching numbered
paragraphs. Each denial shall set forth a specific citation to the record where the factual issue
arises."

[5] L.R. 7.1(a)(3) provides that "<u>The Court shall deem admitted any properly supported
facts set forth in the Statement of Material Facts that the opposing party does not specifically
controvert</u>." However, *see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241,
244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing
the absence of a genuine issue for trial, the district court may not rely solely on the statement of
undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the
citation to evidence in the record supports the assertion.") (citations omitted).

[6] The Clerk's Office mailed Plaintiff the requisite Notification of the Consequences of
Failing to Respond to a Summary Judgment motion on May 23, 2016. (Dkt. No. 35 at 2.)

[7] L.R. 7.1(a)(3) provides that "Any motion for summary judgment shall contain a
Statement of Material Facts. The Statement of Material Facts shall set forth in numbered
paragraphs, each material fact about which the moving party contends there exists no genuine
issue. Each fact listed shall set forth a specific citation to the record where the fact is
established."

complete Statement of Material Facts shall result in a denial of the motion."

This Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion. *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002). However, the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to Plaintiff's pro se status, and because he appears to have made at least some attempt to comply with L.R. 7.1(a)(3) on his cross-motion for summary judgment, the Court has opted to review the entire summary judgment record in this case.

## V.  ANALYSIS

### A.  Exhaustion of Administrative Remedies

#### 1.  Legal Standard for Exhaustion

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). *See also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly").

In New York state prisons, DOCCS has a well-established three-step IGP. N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 7, § 701.5 (2013). Generally, the DOCCS IGP involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. *Id.* at § 701.5(a) (2010). A representative of the facility's Inmate Grievance Resolution Committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance (*Id*. at § 701.5(b)(2)), and issues a written decision within two working days of the conclusion of the hearing. *Id*. at § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id*. at § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id*. at § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the Central Office Review Committee ("CORC") for a decision under the process applicable to the third step. *Id*. at § 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id*. at 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id*. at 701.5(d)(3)(ii). If a prisoner has failed to properly follow each of the applicable steps, including receipt of a decision from CORC, prior to commencing litigation, he has failed to exhaust his administrative remedies and is barred from commencing a federal lawsuit. *Woodford*, 548 U.S. at 93; *Neal v. Goord*, 267 F.3d 116, 122-23 (2d Cir. 2001) (inmate commencing litigation before receiving a decision from CORC does not satisfy PLRA's requirement that administrative remedies be exhausted before filing suit), *overruled on the other grounds*, *Nussle*, 534 U.S. 516; *Martin, II v. Niagara County Jail*, No. 05-CV-868 (JTC), 2012 WL 3230435, at * 6 (W.D.N.Y. Aug. 6, 2012) (inmate who fails to exhaust his administrative remedies is barred from commencing a federal lawsuit).

Because failure to exhaust is an affirmative defense, defendants bear the burden of showing by a preponderance of the evidence that a plaintiff has failed to exhaust his available administrative remedies.[8] *See Murray v. Palmer*, No. 9:03-CV-1010 (GTS/GHL), 2010 WL 1235591, at *4 (N.D.N.Y. Mar. 31, 2010); *Bailey v. Fortier,* No. 09-CV-0742 (GLS/DEP), 2012 WL 6935254, at *6 (N.D.N.Y. Oct. 4, 2012) (the party asserting failure to exhaust bears the burden of proving its elements by a preponderance of the evidence).

A prisoner's failure to exhaust, however, does not end a court's exhaustion review. For more than ten years, courts in this district were guided by the Second Circuit's decision in *Hemphill v. New York*. 380 F.3d 680, 686 (2d Cir. 2004). Under *Hemphill*, the Second Circuit

---

[8] Defendants have asserted failure to exhaust administrative remedies as an affirmative defense in their answer to Plaintiff's amended complaint. (Dkt. No. 27 at ¶ 14.)

established a three-part inquiry to determine whether, *inter alia*, a plaintiff's failure to exhaust available administrative remedies could nevertheless be justified by "special circumstances."[9]  *Id*.  However, on June 6, 2016, the Supreme Court rejected the "special circumstances" exception applied by many circuits, and held that "[c]ourts may not engraft an unwritten 'special circumstance' onto the PLRA's exhaustion requirement."  *Ross v. Blake*, ___ U.S. ___, 136 S.Ct. 1850, 1862 (2016).  In *Ross*, the question before the Court was whether there is a "special circumstances" exception under the PLRA when the inmate erroneously believed that he had satisfied the exhaustion requirement.  *Id*. at 1855.  In an opinion by Justice Elena Kagan, the Supreme Court held that there is no such exception:

> the [PLRA] mandates that an inmate exhaust "such administrative remedies as are available" before bringing suit to challenge prison conditions.  The court below adopted an unwritten "special circumstances" exception to that provision, permitting some prisoners to pursue litigation even when they have failed to exhaust available administrative remedies.  Today, we reject that freewheeling approach to exhaustion as inconsistent with the PLRA.

*Id*. at 1854-55.  (internal citation omitted).

The Supreme Court rejection of the "special circumstances" exception still does not end a court's review "because the PLRA contains its own, textual exception to mandatory exhaustion."  *Id*. at 1858.  Under the PLRA, "the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not

---

[9]  Generally, the "special circumstances" exception was applied where a prisoner has been threatened with physical retaliation for exhausting administrative remedies or where the prisoner reasonably misinterpreted the statutory requirements of the appeals process.  *Giano v. Goord*, 380 F.3d 670, 676 (2d Cir. 2004), *abrogated by Ross v. Blake*, ___ U.S. ___, 136 S.Ct. 1850 (2016).

exhaust unavailable ones." *Id*. Thus, courts are still tasked with determining whether or not a prisoner's administrative remedies are, in fact "available."

To guide courts in this analysis, the Supreme Court identified "three kinds of circumstances" in which an administrative remedy, "although officially on the books," is not "available." *Id*. at 1853. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end   with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id*. at 1853-54. Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*.

## 2. Analysis

There is a factual dispute between the parties as to whether Plaintiff appealed his grievance to CORC. Plaintiff asserts that he appealed on January 23, 2015, but never received a response from CORC. (Dkt. No. 32-3 at 59-61.) DOCCS claims to have no record of his having done so. (Dkt. No. 32-15 at ¶ 14.) Even assuming for purposes of Defendants' summary judgment motion that Plaintiff did submit an appeal to CORC on January 23, 2015, the Court must conclude that Plaintiff did not exhaust his administrative remedies prior to commencing this lawsuit seventeen days later on February 9, 2015.

Under the DOCCS IGP, CORC has thirty days within which to issue a decision on a grievance appeal. *See* 7 NYCRR § 701.5(d)(3)(ii). Plaintiff has testified that he appealed to CORC on January 23, 2014. (Dkt. No. 32-3.) He commenced this lawsuit on February 9, 2015,

15

less than thirty days after his appeal and without having first received a determination on his appeal from CORC.  (Dkt. Nos. 1; 32-3 at 59.)  Therefore, even if Plaintiff appealed to CORC as he claims, he failed to exhaust his administrative remedies by commencing this suit before CORC issued a decision and before CORC's time within which to do so had expired.  *See Woodford*, 548 U.S. at 93 (prisoner who files suit prior to receipt of decision from CORC has failed to exhaust his administrative remedies.)[10]

Furthermore, Plaintiff has failed to show that the IGP was not "available" to him.  *See Ross*, 136 S.Ct. at 1853-54.  There is no evidence in the record showing that the DOCCS IGP operated as a "simple dead end" in this case.  *See id.* at 1853.  Plaintiff has asserted no claim that the IGP was "so opaque" it was incapable of use.  *Id.*  In fact, Plaintiff filed his grievance, received a decision from the Superintendent, and described the procedure for appealing to CORC at his deposition.  (Dkt. Nos. 12 at ¶ 13; 32-3 at 58-60.)   At his deposition, Plaintiff testified that no one stopped him from filing a grievance or an appeal. (Dkt. No. 32-3 at 46).  Therefore, by Plaintiff's own admission, he was not thwarted from "taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 136 S.Ct. at 1854.  Furthermore, there is no evidence in the record that Plaintiff ever submitted any inquiries to the IGRC, CORC, or Bellamy regarding the status of his appeal to CORC before filing this lawsuit, or that he inquired as to why he had not received a decision at any point after the commencement of this action.  In addition, Plaintiff has not responded to Bellamy's statement that there is no record of

---

[10]  Plaintiff would have failed to properly exhaust his administrative remedies even if CORC issued a decision following commencement of the lawsuit.  *See Neal*, 267 F.3d at 122-23 (receiving a decision from CORC after commencing litigation does not satisfy the PLRA's requirement that administrative remedies be exhausted before filing suit) .

Plaintiff having filed an appeal with CORC, or otherwise addressed the Defendants' request for summary judgment on exhaustion grounds in his response to Defendants' motion. (*See generally* Dkt. No. 37.)

Based upon the foregoing, the Court finds that Plaintiff has failed to exhaust his available administrative remedies before commencing this action and, therefore, recommends that Defendants be granted summary judgment without prejudice on those grounds.

### B. Excessive Force and Failure to Intervene Claim

Plaintiff and Defendants have both moved for summary judgment on Plaintiff's Eighth Amendment excessive force and failure to intervene claims. (Dkt. Nos. 32 and 37.) Because the Court is recommending that Defendants be granted summary judgment without prejudice on exhaustion grounds, it has not addressed the parties' entitlement to summary judgment on those grounds.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants motion for summary judgment (Dkt. No. 32) be **GRANTED WITHOUT PREJUDICE** on the grounds that Plaintiff failed to exhaust his administrative remedies before commencing this action; and it is further

**RECOMMENDED** that Defendants motion (Dkt. No. 32) and Plaintiff's cross-motion (Dkt. No. 37) for summary judgment on the merits of Plaintiff's Eighth Amendment claims for excessive force and failure to intervene be **DENIED** without prejudice; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

17

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: November 3, 2016
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

2012 WL 6935254
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Everton BAILEY, Plaintiff,
v.
M. FORTIER, Defendant.

Civ. Action No. 9:09–CV–0742 (GLS/DEP).
|
Oct. 4, 2012.

**Attorneys and Law Firms**

Hancock Estabrook LLP, Michael J. Sciotti, Esq., Robert Thorpe, Esq., of Counsel, Syracuse, NY, for Plaintiff.

Hon. Richard S. Hartunian, United States Attorney, Charles E. Roberts, Esq., Assistant U.S. Attorney, of counsel, Syracuse, NY, for Defendant.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Everton Bailey, a federal prison inmate, has commenced this *Bivens*[1] action against defendant Michelle Fortier, a corrections officer stationed at the prison facility in which Bailey was confined at the relevant times, alleging deprivation of his civil rights. Bailey's claims are based upon Fortier's alleged failure to protect him from an assault by a cellmate, despite having registered prior complaints expressing fear for his safety.

Currently at the forefront of the action is the threshold question of whether Bailey, who admits that he did not file a grievance following the procedures in place at Bureau of Prisons ("BOP") facilities, should be excused from the requirement of exhausting administrative remedies before commencing suit due to the alleged refusal of prison officials to provide him with the forms necessary to file a grievance. Because I find, based upon an evidentiary hearing conducted, that Bailey was not prevented by the actions of prison officials from filing a grievance regarding his claim against Fortier, and that he has offered no special circumstances providing a basis to excuse his failure to exhaust administrative remedies, I recommend that his

complaint be dismissed on this procedural basis, without addressing its merits.

*I. BACKGROUND*

Bailey is a federal prison inmate currently being held in the custody of the BOP as a result of a 2007 criminal conviction entered in the United States District Court for the Eastern District of Pennsylvania. *See generally* Complaint (Dkt. No. 1); *see also* VanWeelden Decl. (Dkt. No. 10–4) ¶ 5; June 20, 2012 Hearing Transcript (Dkt. No. 44) at p. 84.[2] While he is presently housed in another BOP facility, at times relevant to this litigation Bailey was designated by the BOP to the Ray Brook Federal Correctional Institution ("FCI Ray Brook"), located in Ray Brook, New York. *Id.*

On the morning of February 23, 2009, while housed in a six-person cell in the Mohawk Housing Unit at FCI Ray Brook, Bailey was confronted and physically assaulted by one of his cellmates after being accused of stealing that inmate's prayer oil. Complaint (Dkt. No. 1) ¶¶ 8–9; *see also* VanWeelden Decl. (Dkt. No. 10–4) Exh. D. Bailey reported the incident to Fortier, and requested that he be moved to another cell. Complaint (Dkt. No. 1) ¶ 10. That request was denied, and Bailey was directed by Fortier to return to his cell in light of an impending inmate count. *Id.* at ¶ 11.

Following the inmate count, Bailey again was accosted by the same inmate, who on this occasion threw hot oil from a ceramic mug onto his face.[3] Complaint (Dkt. No. 1) ¶ 13; VanWeelden Decl. (Dkt. No. 10–4) Exh. D; Tr. 100, 145. Bailey suffered second degree burns to his face resulting in his being hospitalized at an outside medical facility for a period of fourteen days. Complaint (Dkt. No. 1) ¶¶ 13–14; Tr. 32, 84–85. Upon his return to FCI Ray Brook, Bailey was placed in a special housing unit ("SHU") cell, where he remained until he was transferred to another BOP facility. Tr. 59–60, 85.

**\*2** The BOP has established an Administrative Remedy Program ("ARP"), comprised of a four-step administrative process through which inmates can seek formal internal review of any complaint regarding any aspect of their imprisonment. Tr. 10; 28 C.F.R. § 542.10 *et seq.; see also Macias v. Zenk,* 495 F.3d 37, 42 (2d Cir.2007). In accordance with the established ARP protocol, an inmate must first attempt informal resolution

of his or her complaint by presenting the issue informally to staff, and staff must attempt to resolve the issue. 28 C.F.R. § 542.13(a); *see also Johnson v. Testman,* 380 F.3d 691, 693 (2d Cir.2004). This informal, initial procedure typically begins with the filing of a "cop-out," which can be submitted either on a BP–8 form available to inmates through several sources, including their assigned counselors, or on paper of any other description. Tr. 10, 22, 27, 66–67, 129, 142.

If the complaint cannot be resolved informally, the inmate may next submit a formal written Administrative Remedy Request ("ARR") to the warden of the facility, utilizing a BP–9 form, within twenty calendar days of the event that generated the inmate's complaint.[4] Tr. 22, 32, 44; 28 C.F.R. § 542.14(a); *see also Johnson,* 380 F.3d at 693. That twenty-day period, however, can be extended in appropriate circumstances.[5] Tr. 33, 54, 144. If that formal request is denied, the inmate may next appeal the matter to the appropriate BOP Regional Director, utilizing a BP–10 form, within twenty calendar days of the date the grievance is denied by the facility warden. Tr. 22; 28 C.F.R. § 542.15(a); *see also Johnson,* 380 F.3d at 693. An unfavorable decision from the Regional Director can then be appealed to the General Counsel's office, utilizing a BP–11 form, within twenty calendar days of the date of the Regional Director's response. Tr. 22; 28 C.F.R. § 542.15(a).

Despite the existence of the ARP, Bailey did not avail himself of that process by filing a grievance regarding the assault or the defendant's alleged failure to protect him from it. Tr. 101–02, 106. Bailey claims that he requested the appropriate forms for commencing the grievance process from several prison workers, including Hawley Snyder, Barbara Darrah, and the warden at FCI Ray Brook. Tr. 86–88, 91, 93–95, 107–09. Employees at FCI Ray Brook, however, uniformly testified that Bailey never requested the appropriate grievance forms from them. *See* Tr. 72, 131, 146–47, 153, 155, 168; *see also* Tr. 49 (Robin Van Weelden); 161 (Jean Marie Diehl); 166 (Michelle Gonyea). I credit the testimony of defendant's witnesses and find that Bailey failed to ask his corrections counselor, or any other BOP employee at FCI Ray Brook, for the necessary forms to commence the grievance process.

The record also reflects that Bailey had abundant opportunity to secure the necessary grievance forms. In February and March of 2009, he was assigned a unit

team that included Barbara Darrah, his unit manager; Michelle Gonyea, a case worker; Hawley Snyder, his assigned corrections counselor; and one other corrections counselor.[6] Tr. 46, 86, 140–41. Members of Bailey's unit team, particularly his corrections counselor, were in frequent contact with him. *See, e.g.,* Tr. 126, 129–30, 140–41, 165.

**\*3** Various other BOP officials were also in regular contact with Bailey, making periodic rounds of the FCI Ray Brook SHU. Tr. 35. For example, at the times relevant to this litigation, the facility's warden typically visited the SHU every Wednesday morning, normally accompanied by Robin Van Weelden, who in February 2009 served as a legal assistant, as well as one or two associate wardens, a corrections captain, and unit team members. Tr. 35, 55. When making those rounds the group would proceed from cell to cell, knocking on doors and asking whether an inmate in a particular cell wished to voice any needs. Tr. 57. In addition, Barbara Darrah, as a unit manager, was required to visit inmates in the SHU twice weekly, although she testified that she was in that portion of the facility "pretty much daily." Tr. 126. When visiting the SHU, Darrah generally carried with her a folder of various forms, including BP–8, BP–9, BP–10, BP–11 and cop-out forms, earning her the nickname "the form lady." Tr. 70–71, 120, 124–27, 131. Like the warden and the warden's group, when visiting the SHU facility Darrah normally would proceed from cell-to-cell. Tr. 128. Similarly Michelle Gonyea, as plaintiff's case manager during February and March of 2009, was required to visit the SHU at least once weekly. Tr. 165.

Despite all of those visits and requests as to whether he needed anything, Bailey did not ask any of those individuals for the forms necessary to grieve Fortier's alleged failure to protect him from harm. Tr. 161–62, 166, 49–50, 72, 132, 144, 154–55, 161, 166.

As previously indicated, plaintiff was absent from FCI Ray Brook receiving outside treatment for his injuries during the fourteen-day period immediately following the inmate assault. In accordance with FCI Ray Brook policy requiring visits by prison officials to any inmate hospitalized for more than five days, Darrah, as plaintiff's unit manager, visited him in or about March of 2009, while he was a patient at the Adirondack Medical Center in Saranac Lake, in order to insure that his needs were being

met. Tr. 133. When asked on that occasion whether he needed anything, Bailey replied, "No." [7] *Id.*

## II. *PROCEDURAL HISTORY*

Bailey commenced this action on June 29, 2009. Dkt. No. 1. His complaint identifies Corrections Officer M. Fortier as the sole named defendant, and alleges that she violated his constitutional rights by failing to protect him from foreseeable harm. *Id.*

On January 8, 2010, prior to answering, Fortier moved to dismiss Bailey's complaint for failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or, alternatively, for summary judgment pursuant to Rule 56. Dkt. No. 10. The sole basis for Fortier's motion was her contention that Bailey's complaint is subject to dismissal based upon his failure to exhaust available administrative remedies before commencing suit, as required under 42 U.S.C. § 1997e(a). That motion resulted in my issuance of a report on August 30, 2010, recommending that the motion be denied, based upon the existence of genuine disputes of material fact to be resolved before addressing whether a proper basis for excusing the governing exhaustion requirement had been demonstrated. Dkt. No. 19. That recommendation was adopted by Chief District Judge Gary L. Sharpe on October 12, 2010. Dkt. No. 21.

**\*4** Following the issuance and acceptance of my report and recommendation, the parties were afforded the opportunity to engage in discovery, and a scheduling order was entered requiring, *inter alia,* that any additional dispositive motions be filed on or before October 3, 2011. *See* Dkt. No. 23. All deadlines under that scheduling order have passed, without the filing of any additional motions, and the case is now trial-ready. In light of the existence of a threshold procedural issue regarding exhaustion, the matter was referred to me for the purpose of conducting an evidentiary hearing, pursuant to *Messa v. Goord,* 652 F.3d 305 (2d Cir.2011), in order to develop the record concerning Bailey's efforts to satisfy his exhaustion requirement. *See* Text Entry 11/02/11. That hearing was conducted on June 20, 2012, *see* Text Entry 6/20/12, and, following the close of the hearing, decision was reserved pending briefing by the parties. [8], [9]

## III. *DISCUSSION*

### A. *Governing Legal Principles*
The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan.31, 2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002). An inmate plaintiff's complaint is subject to dismissal if the evidence establishes that he or she failed to properly exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at \*1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94–95, 126 S.Ct. at 2387–88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias,* 495 F.3d at 43 (citing *Woodford* ). Complete exhaustion has not occurred, for purposes of the PLRA, until all of the steps of that available process have been taken. *Macias,* 495 F.3d at 44; *see also Johnson v. Rowley,* 569 F.3d 40, 45 (2d Cir.2009); *Strong v. Lapin,* No. 90–CV–3522, 2010 WL 276206, at \*4 (E.D.N.Y. Jan.15, 2010) ("Until the BOP'S Central Office considers the appeal, no administrative remedy is considered to be fully exhausted.").

**\*5** In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted in the event of a failure to satisfy the PLRA's exhaustion requirement. *Macias,* 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Under the prescribed rubric, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias,*

495 F.3d at 41; *Hemphill,* 380 F.3d at 686. If such a remedy existed and was available, the court must next examine whether the defendant should be deemed to have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through the defendant's own actions preventing the plaintiff from exhausting otherwise available remedies, he or she should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the proffered defense survives these first two levels of scrutiny, the court must determine whether the plaintiff has established the existence of special circumstances sufficient "to justify the failure to comply with applicable administrative procedural requirements. [10] , [11] *Id.*

### B. *Burden of Proof*

Before applying the foregoing legal principles, I must first consider who bears the burden of proof, and whether that burden shifts throughout the analysis prescribed under *Hemphill.*

As an affirmative defense, *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007), exhaustion is a claim upon which the party asserting it typically bears the ultimate burden of proving its essential elements by a preponderance of the evidence. *Soria v. Girdich,* No. 9:04–CV–727, 2007 WL 4790807, at *2 (N.D.N.Y. Dec. 2007) (DiBianco, M.J.) (citing *McCoy v. Goord,* 255 F.Supp.2d 233, 247 (S.D.N.Y.2003)); *McEachin v. Selsky,* No. 9:04–CV–83(FJS/RFT), 2005 WL 2128851, at *4 (N.D.N.Y. Aug.30, 2005) (Scullin, C.J.) (citing *Howard v. Goord,* No. 98–CV–7471, 1999 WL 1288679, *3 (E.D.N.Y. Dec. 28, 1999)), *aff'd in part, vacated in part,* 225 F. App'x 36 (2d Cir.2007). The issue is somewhat complicated, however, by consideration of the three-part analysis mandated by *Hemphill* and related cases because that line of cases incorporates concepts—such as estoppel, for example—that typically require the party asserting them to bear the ultimate burden of proof. *See e.g., Abbas v. Dixon,* 480 F.3d 636, 642 (2d Cir.2007) ("The plaintiff bears the burden of showing that the action was brought within a reasonable period of time after the facts giving rise to the equitable tolling or equitable estoppel ...."); *In re Heflin,* 464 B.R. 545, 554 (D.Conn.2011) ("The burden of providing every element of an estoppel is upon the party seeking to set up the estoppel.") (citing *Comm'r v. Union Pac. R.R. Co.,* 86 F.2d 637, 640 (2d Cir.1936)).

**\*6** Also complicating matters is the fact that several courts have held that once a defendant satisfies the burden of demonstrating that an inmate has failed to exhaust administrative remedies, it then becomes incumbent upon the plaintiff to counter with a showing of unavailability, estoppel, or special circumstances. *See, e.g., Murray v. Palmer,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at *4 and n. 17 (N.D.N.Y. Mar.31, 2010) (Suddaby, J.); *see also Calloway v. Grimshaw,* No. 9:09–CV–1354, 2011 WL 4345299, at *5 and n. 5 (N.D.N.Y. Aug.10, 2011) (Lowe, M.J.) (citing cases); *report and recommendation adopted,* 2011 WL 4345296 (N.D.N.Y. Sep.15, 2011) (McAvoy, S.J.); *Cohn v. KeySpan Corp.,* 713 F.Supp.2d 143, 155 (E.D.N.Y.2010) (finding that, in the employment discrimination context, defendants bear the burden of establishing the affirmative defense of failure to timely exhaust his administrative remedies, but once defendants have done so, the plaintiff must plead and prove facts supporting equitable avoidance of the defense.). Those decisions, while referencing the burden of proof on an affirmative defense, seem to primarily address an inmate's burden of *production,* or of going forward, to show facts that would form the basis for finding of unavailability, estoppel, or a finding of special circumstances, rather than speaking to the ultimate burden of *persuasion.*

I have been unable to uncover any cases squarely holding that the defendant bears the ultimate burden of proof with regard to all elements of a *Hemphill* analysis. In the final analysis, however, *Hemphill* addresses all of the elements a court is required to consider when analyzing an exhaustion defense. *See Macias,* 495 F.3d at 41 ("In *Hemphill* we "read together" [a series of cases] and formulated a three-part *test* ....") (emphasis added). Therefore, I recommend a finding that, while the burden of production may shift to the plaintiff when a court undertakes a *Hemphill* analysis, the ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the defendant. *See Soria,* 2007 WL 4790807, at *2 ("[A]s with other affirmative defenses, the defendant has the burden of proof to show that plaintiff failed to exhaust his administrative remedies.").

### C. *Application of Governing Legal Principles*

#### 1. *Availability of Administrative Remedy*

In this instance, the question of whether the ARP was available to Bailey is at the heart of the exhaustion

analysis. The hearing testimony confirmed, and Bailey admitted, that at all times relevant to this litigation, there was an inmate grievance procedure in place at FCI Ray Brook. This, however, does not necessarily mean that it was "available" to the plaintiff.

Bailey contends that the grievance process was not available to him in light of the alleged refusal of prison officials to provide him with the forms necessary to file an ARR and pursue the grievance to culmination. Having considered the competing testimony, however, I conclude that Fortier has established, by a preponderance of the evidence, that the forms necessary to pursue a grievance in accordance with the ARP in place at FCI Ray Brook were available to Bailey through several sources, but were not requested. As such, Fortier has satisfied the first *Hemphill* factor.

### 2. *Presentation of Defense/Estoppel*

**\*7** The focus of the second prong of the *Hemphill* analysis is upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted). In her answer, Fortier raised exhaustion as a defense in a timely fashion. *See* Answer (Dkt. No. 22) Second Defense ("Plaintiff clearly failed to exhaust his administrative remedies, as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a).""). Bailey argues, however, that his failure to follow the prescribed grievance process was a direct result of the refusal of prison officials to cooperate in his efforts to grieve the matter.

" 'Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals.' " *Atkins v. Menard,* No. 9:11–CV–9366, 2012 WL 4026840, at \*3 (N.D.N.Y. Sept.12, 2012) (Suddaby, J.) (citing *Murray,* 2010 WL 1235591, at \*5 and n. 26 (collecting cases)). Put differently, a plaintiff must allege that a defendant named in the lawsuit acted to interfere with his ability to exhaust in order to establish a basis to estop that defendant from invoking the exhaustion defense. *Calloway,* 2011 WL 4345299, at \*4 (citing *Bennett v. James,* 737 F.Supp.2d 219, 226 (S.D.N.Y.2010), *aff'd,* 441 F. App'x 816 (2d Cir.2011)) (other citations omitted).

The question of whether, in this instance, prison officials should be estopped from asserting failure to exhaust as an affirmative defense as a result of their conduct is inextricably intertwined with the question of availability of the remedy. Assuming, however, that this presents a distinct inquiry, the court must examine whether, through her conduct, Fortier has provided a basis to estop her from asserting an exhaustion defense.

In this instance, Bailey does not allege that Fortier engaged in a campaign to preclude him from filing a grievance regarding her actions. Instead, his focus is upon the alleged refusal of other officials at FCI Ray Brook to provide him with necessary forms and cooperate in his efforts to present his grievance against Fortier. Accordingly, Bailey has failed to present any evidence that would support an estoppel against the defendant from raising the issue of exhaustion. *Atkins,* 2012 WL 4026840, at \* 3 . Therefore, I conclude that Fortier has proven, by a preponderance of the evidence, that she did not, through her own actions, preclude Bailey from taking advantage of the ARP and therefore should not be estopped from asserting the defense.

### 3. *Special Circumstances*

The third, catchall factor that must be considered under the Second Circuit's prescribed exhaustion rubric centers upon whether special circumstances sufficient to justify excusing the plaintiff's failure to exhaust administrative remedies have been demonstrated. *Hemphill,* 380 F.3d at 689; *see also Giano,* 380 F.3d at 676–77; *Hargrove,* 2007 WL 389003, at \*10. Among the circumstances potentially qualifying as "special" under this prong of the test is where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676–77; *see also Hargrove,* 2007 WL 389003, at \*10 (quoting and citing *Giano* ). Special circumstances may also exist when a facility's "[f]ailure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance process unavailable to him." *Murray,* 2010 WL 1235591, at \*6 (quoting *Sandlin v. Poole,* 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendant's are estopped from

relying on exhaustion defense as 'special circumstances' excusing plaintiff's failure to exhaust")).

**\*8** During the evidentiary hearing, Bailey testified to his awareness of the existence of the ARP at FCI Ray Brook. *See, e.g.,* Tr. 102. Bailey's testimony regarding his alleged efforts to secure the forms necessary to pursue the grievance plainly evidences his knowledge of the requirement that he exhaust available administrative remedies, and negates a finding of any reasonable belief on his part that the dispute in issue was not grievable and could not have been presented through the BOP's internal grievance process. Accordingly, again allocating the ultimate burden of proof on the issue of special circumstances to the defendant, I nonetheless conclude that she has demonstrated, by a preponderance of the evidence, the absence of any special circumstances that would serve to excuse plaintiff's failure to exhaust administrative remedies.

IV. *SUMMARY AND RECOMMENDATION*
The credible testimony and evidence adduced at the recent hearing, held to address the merits of defendant's exhaustion defense, establishes that (1) Bailey failed to avail himself of the BOP grievance process, which was available to him, before commencing this action; (2) Fortier did not, through her actions, preclude Bailey from filing a grievance regarding the claims set forth in his complaint, or otherwise engage in conduct for which she should be estopped from asserting failure to exhaust as an affirmative defense; and (3) Bailey has offered no special circumstances warranting that he be excused from the PLRA's exhaustion requirement. Accordingly, it is therefore hereby respectfully

RECOMMENDED, that plaintiff's complaint in this action be DISMISSED, based upon his failure to comply with the exhaustion requirements of 42 U.S.C. § 1997e(a).

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).*

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 6935254

---

Footnotes

1    *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

2    The June 20, 2012 Hearing Transcript (Dkt. No. 44) will hereinafter be cited as "Tr. ____".

3    According to Bailey, there were no corrections officers present in his cell unit at the time of the assault. Complaint (Dkt. No. 1) ¶ 13.

4    Plaintiff was aware of the twenty-day limitation for filing a BP–9 form to initiate the formal grievance process. Tr. 103.

5    Here, the record demonstrates that in light of his circumstances, including the fourteen-day period of hospitalization following the incident, Bailey almost certainly would have been granted relief from that requirement had such a request been made. *See* Tr. 43, 144. I note, parenthetically, that the handbook provided to inmates at FCI Ray Brook does not address the possibility of requesting an extension of the twenty-day time limit for filing a BP–9. *See* Tr. 34, 43.

6    Jean Marie Diehl took over as plaintiff's correction counselor in or about September 2009, shortly before Snyder's retirement from the BOP. Tr. 140, 163.

7    During the hearing Bailey testified that he did not recall Darrah visiting him. *See* Tr. 114. Once again, I credit the testimony of Darrah over that of the Bailey with respect to this issue.

8    The hearing was conducted by video conference, with Bailey participating and testifying from the Kentucky federal correctional facility in which he is currently being held, pursuant to Rule 43(a) of the Federal Rules of Civil Procedure. *See Rivera v. Santirocco,* 814 F.2d 859, 862 (2d Cir.1987). At the outset of the hearing I placed upon the record the factors which I considered in declining to exercise my discretion to require that Bailey be produced in person for the evidentiary hearing. *See* Tr. 3.

**9** Attorney Michael J. Sciotti, Esq., of the firm of Hancock & Estabrook, LLP, was appointed in January 2012 to represent the plaintiff in this action, *pro bono,* at the hearing. The court wishes to express its thanks to Attorney Sciotti and his co-counsel, Robert Thorpe, Esq., for their energetic and diligent efforts on behalf of the plaintiff.

**10** In *Macias,* which, like this action, involved an Eighth Amendment claim under *Bivens,* as well as claims under the Federal Court Claims Act, 28 U.S.C. § 2671 *et seq.,* defendants asserted that plaintiff's complaint was subject to dismissal under the PLRA based upon his failure to exhaust available administrative remedies. *Macias,* 495 F.3d at 40. Reiterating the importance of exhaustion in both a substantive and a procedural sense, the Second Circuit concluded that, while a prisoner may have substantially exhausted remedies by making informal complaints regarding the conditions at issue, the PLRA, as illuminated by *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368, requires proper procedural exhaustion through the available grievance channels. *Id.* at 41. The court left open, however, the possibility that, notwithstanding the Supreme Court's decision in *Woodford,* a defendant could be precluded from asserting failure to exhaust available administrative remedies in the event of a finding that threats by prison officials may have deterred compliance with the PLRA exhaustion requirements, including under *Hemphill. Id.* at 44–45. The court in *Macias* also noted that the plaintiff in that case did not assert that the available internal remedial scheme was so confusing as to excuse his failure to avail himself of that process, thereby obviating the need for the court to determine what effect, if any, *Woodford* would have upon the *Hemphill* holding to the effect that a reasonable misinterpretation of the available scheme could justify an inmate's failure to follow the procedural rules. *See Amador v. Superintendents of Dep't of Correctional Serv.,* No. 03 CIV. 0650 (KTD/CWG), 2007 WL 4326747, at *6 (S.D.N.Y. Dec.4, 2007). It therefore appears that the teachings of *Hemphill* remain intact, at least with regard to the first two points of inquiry. *Id.* at *7.

**11** In practicality, these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap. *See Hargrove,* 2007 WL 389003, at *8 n. 14; *see also Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

---

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1**  The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*'s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

### B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

### *Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with

the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

Footnotes

1    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

**End of Document**        © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Topalian v. Hartford Life Ins. Co., E.D.N.Y., May 16, 2013

2010 WL 571818
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Dov FERSHTADT, Plaintiff,

v.

VERIZON COMMUNICATIONS INC., the
Plan for Group Insurance, Metropolitan
Life Insurance Company, and Unum Life
Insurance Company of America, Defendants.

No. 07 Civ. 6963(CM).
|
Feb. 9, 2010.

West KeySummary

1    **Federal Civil Procedure**
       👉 Employees and Employment
     Discrimination, Actions Involving

A genuine issue of material fact as to
what date was appropriate to determine a
claimant's long-term disability benefits rate
precluded summary judgment in favor of an
ERISA plan administrator. The claimant's
employer solicited an election from the
claimant to enroll in a new benefit plan
despite the fact that the claimant was already
receiving short-term disability benefits at
that time. Therefore it was unclear whether
the claimant's long-term disability rate was
determined as of the date he began the
collection of short-term disability benefits
or as of the date that the claimant made
the election into the more generous plan.
Employee Retirement Income Security Act of
1974, § 502(a)(1)(B), 29 U.S.C.A. § 1132(a)(1)
(B).

Cases that cite this headnote

DECISION AND ORDER GRANTING THE
MOTION FOR SUMMARY JUDGMENT OF
METROPOLITAN LIFE INSURANCE COMPANY,
GRANTING IN PART AND DENYING IN PART
THE MOTION FOR SUMMARY JUDGMENT
OF VERIZON AND THE PLAN FOR GROUP
INSURANCE, DEFERRING RESOLUTION OF
THE MOTION FOR SUMMARY JUDGMENT
OF UNUM LIFE INSURANCE COMPANY OF
AMERICA, AND DENYING THE PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT

COLLEEN McMAHON, District Judge.

*INTRODUCTION*

**\*1** Plaintiff, Dov Fershtadt, commenced this action on
August 2, 2007. His complaint raised various claims under
New York law and the Employee Retirement Income and
Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461,
related to a denial of his claim for long-term disability
benefits under an employee welfare benefit plan.

On April 24, 2008, this Court dismissed all but one of
plaintiff's claims—a claim for benefits under ERISA §
502(a)(1) (B), 29 U.S.C. § 1132(a)(1)(B). Thereafter, the
parties cross-moved for summary judgment.

Plaintiff argues that he is entitled to summary judgment
reversing the denial of his claim.

Defendants Metropolitan Life Insurance Company
("MetLife") and Verizon Communications, Inc.
("Verizon") argue that they are entitled to summary
judgment because they are not proper defendants in the
appeal since they are neither plan administrators nor
plan trustees. Defendant Unum Life Insurance Company
("Unum") has joined in these motions, which the Court
understands as a motion by Unum for summary judgment
dismissing it for the same reasons put forward by MetLife
and Verizon.

In the alternative, Verizon and The Plan for Group
Insurance ("PGI"), joined by Unum, argue that they are
entitled to summary judgment affirming the denial of
benefits.

Finally, Verizon, PGI and plaintiff have all moved to strike certain documents on the ground that they fall outside the scope of the administrative record.

For the reasons set forth below, the motion for summary judgment filed by MetLife (docket no. 51) is granted; the motions for summary judgment filed by Verizon and PGI (docket no. 57) are granted in part and denied in part; the motion for summary judgment filed by Mr. Fershtadt (docket no. 60) is denied; all motions to strike (docket nos. 84 & 90) are denied. Unum's motion for summary judgment (docket no. 64) will be decided following additional submissions,

### FACTS

Plaintiff Dov Fershtadt worked as an "outside plant engineer" at Verizon. (Pl.'s Rule 56.1 Statement ("Pl.'s 56.1 Stmt.") ¶ 3.) His employment with Bell Atlantic, a predecessor company, began in 1982. (Compl. ¶ 15; Verizon & PGI Rule 56.1 Statement ("Verizon 56.1 Stmt") ¶ 1; *see also* Pl.'s 56.1 Statement ¶ 3.) His office was located in Tower 2 of the World Trade Center, which was destroyed on September 11, 2001. (Pl.'s 56.1 Stmt. ¶¶ 4–5.)

Despite the attack, Mr. Fershtadt was instructed to return to work the next day, and he reported to work at a new location, the JP Morgan Chase building on September 12, 2001. (*Id.* ¶ 6.) Thereafter, plaintiff "reached a point where he could no longer continue to work and felt that he had no choice but to take disability leave for a couple of months," which he did. (*Id.* ¶ 7.) He returned to work, but continued to suffer from "recurring fear, flashbacks, and the trauma of not knowing whether he would survive to see his wife and children again." (*Id.* ¶ 8.) Mr. Fershtadt was eventually diagnosed with "Post Traumatic Stress Disorder ('PTSD'), Depression, Organic Brain Syndrome, and Dementia." (*Id.* ¶ 11.)

 **\*2** Verizon provides both short- and long-term disability benefits for employees who cannot work due to medical conditions. While employed at Bell Atlantic, Mr. Fershtadt participated in something called the Bell Atlantic Disability Plan (the "Bell Atlantic Plan"). (*Id.* ¶ 20.) The terms of the plan entitled certain employees who became disabled, like Mr. Fershtadt, to long-term disability benefits in the amount of 50% of their pre-disability income, subject to an annual

maximum of $420,000. (*Id.* ¶ 21; Verizon & PGI Rule 56.1 Counterstatement ("Verizon Cntrstmt.") ¶ 21.) Employees who participated in the plan at the 50% level were not required to make contributions, which meant that any benefits they received were taxable under the Internal Revenue Code. (Verizon 56.1 Stmt. ¶ 6; Bell Atlantic Disability Plan § 4.2.4 (VER0831).) The Bell Atlantic Plan also had two other benefits levels, a 60% and 70% level; however, those levels required the payment of premiums, and plaintiff paid no premiums into the Bell Atlantic Plan. (Verizon 56.1 Stmt. ¶ 4.)

In 2000, Verizon was created by the merger of Bell Atlantic Corp. and GTE Corp. Each of the corporations that came together to make Verizon had its own disability plan, with its own benefits.

Verizon contents that the Bell Atlantic Plan (also known as the "Legacy LTD Plan") in which plaintiff participated was consolidated into something called the Verizon Plan for Group Insurance as of January 1, 2002. (Verizon 56.1 Stmt. ¶ 8.) However, the Plan for Group Insurance documentation provides only that certain Bell Atlantic plans, including those numbered "515, 545, 547, 548, 554, 568 and 577" were to "merge ... with and into the Plan for Group Insurance, with the Plan for Group Insurance being the surviving plan." (The Plan for Group Insurance, as amended and restated effective Jan. 1, 2002, at 1 (VER1100).) The copy of the Bell Atlantic Plan that Verizon has provided to the Court contains no identifying plan number.

Beginning in October 2001, Bell Atlantic employees were given two options: they could retain the disability insurance coverage they enjoyed under the Bell Atlantic Plan (by taking no action), or they could elect to participate the "Verizon LTD Plan" (the "Verizon Plan"). Like the Bell Atlantic Plan, the Verizon Plan offered an option, pursuant to which an employee could elect to receive 50% of his pre-disability income. The Verizon Plan also offered employees an opportunity to elect to receive 66 2/3% of his pre-disability income, regardless of which benefits level was elected, so any benefits received under the terms of the Verizon Plan were non-taxable. (Verizon 56.1 Stmt. ¶¶ 10, 20–21.) But unlike the Bell Atlantic Plan, the Verizon Plan required the payment of premiums.

Verizon employees were offered an opportunity to change their long-term disability benefits during any "benefits

renewal period." (Eyes on VZ Benefits Information ("2004 SPD") at 8–17 (VER1049).) There was a benefits renewal period every year, and a Summary Plan Document ("SPD") explaining the plan(s) and the benefits available thereunder was prepared for distribution to employees. Plan administrators must furnish to participants a summary plan description pursuant to ERISA § 101(a), 29 U.S.C. § 1021(a). The SPD must "be written in a manner calculated to be understood by the average plan participant," and must "be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." ERISA § 102(a), 29 U.S.C. § 1022(a). The SPD must describe, among other things, the plan's requirements governing eligibility for participation and benefits as well as the procedures for presenting claims for benefits. ERISA § 102(b), 29 U.S.C. § 1022(b).

**\*3** Mr. Fershtadt began receiving short-term disability in July 2004. His short-term disability benefits were paid in accordance with the terms outlined in the 2004 SPD. (Verizon 56.1 Stmt. ¶ 14.)

Plaintiff contends that he never "applied for benefits under any specific plan." (Pl.'s Rule 56.1 Counterstatement ("Pl.'s 56.1 Cntrstmt.") ¶ 14.) But plaintiff, like every other Verizon employee, had an annual opportunity to elect which plan to participate in, and there is no evidence that he elected participation in anything other than the (Bell Atlantic) Legacy Plan at the 50% benefits level for the year 2004.

Because Mr. Fershtadt was, by election, a participant in the Bell Atlantic (or Legacy) Plan at the 50% benefits level, had he begun receiving long-term disability benefits in July 2004, it is beyond cavil that those payments would have been in the amount of 50 of his pre-disability earnings, taxable, and subject to an annual maximum of $420,000.

However, Mr. Fershtadt did not begin receiving long-term disability benefits until July 2005.

On October 12, 2004—while he was receiving short-term disability benefits, plaintiff received an email from the Verizon's "HR Communications." It said the following:

> The former Bell Atlantic long-term disability (LTD) option in which you're currently enrolled is changing for 2005. As announced

> recently, Verizon is consolidating the LTD options to offer consistent coverage choices to all management employees. For 2005, you will have a choice of two employee-paid LTD options that replace either 50% or 66 2/3% of your annual benefits compensation. Or, you may choose no coverage. If you don't make a choice during benefits renewal, you'll be assigned the 50% option and payroll contributions will begin in January.

(Email from Verizon HR Communications to D. Fershtadt, October 12, 2004, at 1 (VER0070).) The 2004 SPD provides that an individual may "elect coverage under the Verizon LTD Plan ... during any benefits renewal period." (2004 SPD at 8–17 (VER1049).) This provision does not specifically bar individuals who were already receiving short-term disability benefits from making a new election, so in October 2004, during the company's annual benefits renewal period, Mr. Fershtadt—who, one infers, anticipated a lengthy period of disability—submitted an election to be covered by the Verizon LTD Plan, which would provide him with long-term disability benefits of 66 2/3% of his pre-disability income. (Pl.'s 56.1 Stmt. ¶¶ 30–33; Verizon 56.1 Stmt. ¶ 20 (citations omitted).)

Verizon confirmed plaintiff's selection in writing on October 22, 2004. (*See* Benefits Confirmation, Oct. 22, 2004 (VER0075).) Plaintiff paid premiums to participate in the plan, and Verizon accepted and processed those payments. (Pl.'s 56.1 Stmt. ¶ 37.)

Furthermore, plaintiff had numerous conversations about his benefits with Verizon representatives, who uniformly represented to him that he qualified for long-term disability payments under the Verizon Plan beginning in January 2005. (*Id.* ¶¶ 42–49.) In August 2005, Mr. Fershtadt also received a document entitled "Confirmation of Coverage Status Change," which indicated that he would receive long-term disability benefits under the Verizon Plan at the level of 66 2/3% of his pre-disability income. (Verizon 56.1 Stmt. ¶ 22.)

**\*4** Mr. Fershtadt's eligibility for short-term disability benefits expired after 52 weeks, on July 30, 2005. (*Id.* ¶ 15.) He then began receiving long-term disability benefits.

The benefits were not paid at the rate of 66 2/3% of his pre-disability income. Specifically, from August 2005– June 2006, he received $6,529 per month; in July 2006, he received $9,382; in August 2006, he received $7,284, and that month, for the first time, his benefits were held to be taxable. (Pl.'s 56.1 Stmt. ¶ 16.)

In August 2006, Mr. Fershtadt's benefits were terminated pursuant to a provision in the 2004 SPD that that purportedly "limited benefits to 12 months for disabilities arising from mental or nervous illnesses or conditions ('M & N Limitations Provision')." (Pl.'s 56.1 Stmt. ¶ 54 (*citing* VER0069).) The Bell Atlantic Plan contained no such limitation, but such limitation appears to have applied to members of the 2004 Verizon Long Term Disability Plan —which no one argues is applicable to Mr. Fershtadt's claim.

Therefore, Mr. Fershtadt appealed his denial of benefits (to third-party claims administrator MetLife), and by letter dated September 18, 2006, his benefits were reinstated. (*Id.* ¶ 58 (*citing* VER0052).)

However, in that letter, MetLife also communicated to him that Verizon had instructed MetLife to adjudicate his claims under the "Verizon Management 2004 plan effective 1/1/2004," or the 2004 SPD. (Letter from MetLife to D. Fershtadt, Sept. 18, 2006, at 1 (VER0052).) According to the terms of that plan, MetLife explained, Mr. Fershtadt's benefits were "calculated by taking 50% of your basic monthly salary of 20,058.23, or the maximum LTD benefit payment of $8,333.00 the lesser of the two, resulting in a maximum monthly benefit payment of $8,333.00." (*Id.*) Although the 2004 SPD provided that long-term disability benefits under the plan were nontaxable, the letter further explained, "because you paid your Long Term Disability premiums with post tax dollars, the benefits you receive *will* be taxable." (*Id.* (emphasis added).)

On November 16, 2006, plaintiff, through his attorney, first complained directly to Verizon about his benefits determination. On that day, he submitted a 22–page claim seeking benefits under the Verizon Plan that he believed he had elected in October 2004. (*See* Verizon 56.1 Stmt. ¶ 22 (acknowledging submission of claim).)

By letter dated January 4, 2007, the "Verizon Claims Review Unit" (the "VCRU") denied his claim. (*Id.* ¶ 23.)

Plaintiff filed an appeal by letter dated April 27, 2007. (*Id.* ¶ 24.) He heard nothing for some months, and he filed this lawsuit on August 2, 2007. Five days later, on August 7, 2007, the Verizon Claims Review Committee (the "VCRC") denied Mr. Fershtadt's appeal—and finally explained the reason why. Specifically, the VCRC stated:

> On June 14, 2007, the Verizon Claims Review Committee ... reviewed your request ... to receive Long– Term Disability ('LTD') benefits under The Plan for Group Insurance (the 'Plan') under Option 3–66 2/3% of pay....
>
> **\*5** Based on all of the information available to the Committee and after a thorough review of the claim file, your request has been denied. Therefore, Mr. Fershtadt will continue to receive benefits in accordance with the provisions of the former Bell Atlantic Plan, which is Option 6–50% of pay....
>
> In accordance with the terms of the Plan, because Mr. Fershtadt was approved for STD [short-term disability] benefits in July 2004, and he did not return to work at any time before he commenced his LTD benefits, his LTD benefits are based on the LTD option he was enrolled in when he was approved for STD benefits, which is Option 6, 50% of pay....
>
> Although Mr. Fershtadt was allowed to enroll in the employee-paid 66 2/3% of pay LTD option during the benefit renewal period for the 2005 plan year, his LTD benefits must be paid in accordance with the option that he was enrolled in when his STD benefits were approved, which is the former Bell Atlantic Option 6– 50% of pay.

(Letter from VCRC to M. Hiller, Aug. 7, 2007 (the "Final Denial Letter"), at 1–2 (VER002–003).)

The letter also explains that his eligibility must be determined according to the terms of the 2004 SPD, which is the document that defendants argue limits long-term disability benefits to the plan an employee was enrolled in on the date he began receiving short-term disability benefits. (*Id.* at 2 (VER003).) The letter continues:

> In reviewing Mr. Ferstadt's appeal, we discovered that his LTD benefit is not being administered in accordance with the provisions of Option 6–50% of pay, as his payments are currently being subject to an

$8,333 monthly cap.... Based on our findings, MetLife's records have been updated to reflect the adjusted monthly LTD payment of $10,029....

Additionally, the [Committee] was advised that LTD premiums in the amount of $30.77 were erroneously deducted from Mr. Fershtadt's pay for 16 pay periods. Since the former Bell Atlantic LTD 50% pay option is non-contributory, enclosed with this letter is a check made payable to Mr. Fershtadt in the amount of $492.32 [the amount of the contributions]....

The Committee is aware that Mr. Fershtadt received incorrect information from representatives of the Verizon Benefits Center and we apologize for any confusion it may have caused.

(*Id.* at 3 (VER004).)
The issue for decision is whether plaintiff is entitled to the higher benefits he elected to receive in October 2004 or was limited to the lesser benefits available under the Bell Atlantic Plan that covered him when he began collecting short-term disability benefits.

### The 2004 SPD

The 2004 SPD contained the following language, which referred to eligibility under the Verizon Plan:

> Your contributions for LTD coverage are based on your annual benefits compensation as of July 1 of the prior calendar year and the LTD option you chose. Your benefits, however, are based on your annual benefits compensation ... on the date you become totally disabled (that is, the first date of STD [short-term disability] ) and the LTD option you chose during that benefit plan year.

**\*6**  (2004 SPD at 8–17 (VER1049).)

The 2004 SPD also provided that: "the maximum monthly LTD benefit the plan will pay, based on the options available to you, are [sic]:

• 50% of annual benefits compensation option: Maximum monthly benefit is $8,333

• 66–2/3% of annual benefits compensation option: Maximum monthly benefit is $11,111."

(2004 SPD at 8–19 (VER1051).)
These provisions make the amount of a plan participant's long-term disability benefit a function of: (1) the compensation he was receiving on the date he first began collecting short-term disability, and (2) the long-term disability benefit plan option chosen by the employee for "that benefit plan year." According to Verizon, the phrase "that benefit plan year" limits an employee's long-term disability to the long-term disability benefits he had elected when he began receiving short-term disability benefits.

### *DISCUSSION*

#### I. Legal Standard

Although this case involves the review of an administrative record, the familiar summary judgment standard applies. *See Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.,* 440 F.3d 571, 575 (2d Cir.2006). The burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. ("FRCP") 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (*quoting* FRCP 56(c)); *accord Miner v. City of Glens Falls,* 999 F.2d 655, 661 (2d Cir.1993). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

Where the nonmoving party has the burden of proof at trial, the moving party need only demonstrate that there is a lack of evidence to support the nonmovant's claim. *Celotex,* 477 U.S. at 323–25; *Tops Mkts., Inc. v. Quality Mkts., Inc.,* 142 F.3d 90, 95 (2d Cir.1998). Once the movant has established a prima facie case demonstrating the lack of a genuine issue of material fact, the nonmoving party must provide enough evidence to support a jury verdict in its favor. *Anderson,* 477

U.S. at 248; *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). A plaintiff, as the nonmovant, may not rely on conclusory statements or mere contentions that the evidence in support of summary judgment is not credible. *Ying Jine Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993). Similarly, a plaintiff may not rest "merely on allegations or denials" in its complaint to demonstrate the existence of a genuine issue of material fact. FRCP 56(e). Therefore, after discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex,* 477 U.S. at 323. When addressing a motion for summary judgment, the Court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.1992). Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant,* 923 F.2d at 982.

### A. Unpleaded Claims and Improper Parties

**\*7** There are two threshold matters currently before the Court.

First, plaintiff currently has one claim pending against defendants: a claim for benefits under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). But in his motion for summary judgment, plaintiff seeks judgment on unpleaded claims, including a request for civil penalties pursuant to ERISA § 502(c), 29 U.S.C. § 1132(c). Any claims not raised in his complaint, including the 502(c) claim, are not properly before this Court. No motion for leave to amend the complaint has even been made, and the case is almost three years old—and at the stage when dispositive motions are pending. The Court declines to consider these new and unpleaded claims, and plaintiff's motion for summary judgment on them in his favor is denied. *See, e.g., LaFramboise Well Drilling, Inc. v. RJ. Dooley & Assocs., Inc.,* No. 05 Civ. 0956, 2007 WL 430285, at \*5 (S.D.N.Y. Feb. 7, 2007) (denying summary judgment on unpleaded claim).

Second, MetLife and Verizon argue they are entitled to summary judgment because neither is a "plan administrator" or "plan trustee," and "in a recovery of benefits claim, only the plan and the administrators and trustees of the plan in their capacity as such may be held liable." *Leonelli v. Pennwalt Corp.,* 887 F.2d 1195, 1199

(2d Cir.1989); *see also Paneccasio v. Unisource Worldwide, Inc.,* 532 F.3d 101, 108 (2d Cir.2008) (same). They argue that this is true even if they exercised some discretion and authority in rendering benefits determinations. *See Krauss v. Oxford Health Plans, Inc.,* 418 F.Supp.2d 416, 434 (S.D.N.Y.2005) ("An entity may 'administer' some elements of a covered Plan as a fiduciary without being the plan administrator.").

Unum has joined in this motion (docket no. 64), but PGI has not moved on this ground, because it is "the plan" and, therefore, is amenable to suit. (*See* The Plan for Group Insurance, Article 1 (VER1100); Verizon & PGI Mem. in Supp. of Mot. for Summ. J., Mar. 16, 2009, at 10 (acknowledging that PGI is a proper party to the suit).)

ERISA defines the term "administrator" to mean "the person specifically so designated by the terms of the instrument under which the plan is operated" or "if the administrator is not so designated, the plan sponsor." 29 U.S.C. § 1002(16)(A). Metlife and Verizon are correct.

The relevant plan documents make clear that MetLife was not the "plan administrator," and therefore, it is improperly named as a defendant in this action for benefits under ERISA § 502(a)(1)(B). (*See* 2004 SPD at 9–3 (VER1061); *accord* 2005 SPD 9–4.) Further, the plan documents indicate that MetLife neither insures nor funds the plan nor had any responsibility for making the eligibility decision regarding Mr. Fershtadt's long-term disability benefits. (*See* 2004 SPD at 9–6 (VER1064); *accord* 2005 SPD at 9–7; *see also* Letter from MetLife to D. Fershtadt, Sept. 18, 2006, at 1 (indicating that Verizon determined that the 2004 SPD applied to Mr. Fershtadt's disability claims) (VER0052).) Accordingly, it is not a proper party to this litigation.

**\*8** Likewise, Verizon was the plan's sponsor and plaintiff's employer, but it is not the plan administrator. (*See* 2004 SPD at 9–3 (VER1061); *accord* 2005 SPD 9–3.) According to both the 2004 and 2005 SPDs, the "Chairperson of the Verizon Employee Benefits Committee" is the plan administrator. (2004 SPD at 9–3, 9–6 (VER1061, VER1064); 2005 SPD 9–4, 9–7.) Further, the 2004 and 2005 SPDs state that the Verizon Employee Benefits Committee (the "VEBC") has delegated its authority to the Verizon Claims Review Committee (the "VCRC") to render eligibility decisions, suggesting that either or both may be amenable

to suit. (2004 SPD at 9–20 (VER1078); 2005 SPD at 9–21.) Although both the VEBC and VCRC are staffed by employees of Verizon Communications, Inc., the corporate entity *itself is* not named as the plan administrator, and therefore is not a proper party in an action for recovery of benefits. This rule is applied strictly in this Circuit; even if Verizon had acted as a "de facto co-administrator," it would still not be amenable to suit on plaintiff's claims because it was not listed as the plan administrator in the SPDs. *See Crocco v. Xerox Corp.,* 137 F.3d 105, 107 (2d Cir.1998).

Mr. Fershtadt attempts to argue around these facts, by alleging that a "plan fiduciary," like MetLife or Verizon, can be sued under ERISA to the extent it "exercises any discretionary authority or discretionary control respecting management of such plans or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A). But while this may be true for certain causes of action arising under ERISA, the Second Circuit has made clear that in a denial of benefits appeal under ERISA § 502(a)(1)(B), plaintiff's sole remaining claim, "only the plan and the administrators and trustees of the plan in their capacity as such may be held liable." *Paneccasio v. Unisource Worldwide, Inc.,* 532 F.3d 101, 108 (2d Cir.2008); *Crocco v. Xerox Corp.,* 137 F.3d 105, 107 n. 2 (2d Cir.1998). And that is the only claim pleaded. Because MetLife and Verizon are not plan administrators or plan trustees, they are entitled to summary judgment dismissing them as defendants in this suit.

For the same reasons that MetLife and Verizon are improper parties, it would appear that plaintiff's claims against Unum must be dismissed. Both the 2004 and 2005 SPDs lists "UnumProvident" as an "outside administrative organization," which "provides long-term disability benefits." But the documentation also identifies the Verizon Employee Benefits Committee as the plan administrator and indicates that the plans are "self-insured" by Verizon. (2004 SPD at 9–6 (VER1064); 2005 SPD at 9–7.) If Unum is not named as the plan administrator or a plan trustee and does not fund the plan, it is not a proper party to this action. However, Unum has done nothing except join in MetLife and Verizon's motions, without offering evidence in support of its own situation. I will give Unum 10 days to submit evidence explaining what it does as an "outside administrative organization," to whom it answers and whether it provides

insurance for the plans. Plaintiff will then have 10 days to show cause why summary judgment should not be granted in Unum's favor. There will be *no* extensions allowed.

**\*9** The suit remains alive against PGI, as "the plan."

### B. Motions to Strike

There are two motions to strike currently pending before this Court. PGI has filed a motion to strike a declaration signed by counsel for plaintiff (docket no. 67) on several grounds, including technical noncompliance with FRCP 56(e). [1] Plaintiff's counsel has attempted to remedy the errors identified by PGI through his supplemental declaration (docket no. 99), and, accordingly, PGI's motion to strike is denied.

Additionally, plaintiff has submitted a motion to strike certain documents from the record. Plaintiff seeks to exclude the 2005 SPD, because, inter alia, it has not been properly authenticated and because it is not included in the administrative record. He also seeks to exclude the Final Denial Letter, because it was sent five days after this suit was commenced; he argues that it cannot be properly considered a part of the administrative record.

Plaintiff's motion to strike is denied.

The 2005 SPD has been properly authenticated by Stephanie Zweban, Director of Benefits at Verizon Corporate Resources Group, who submitted a declaration stating her familiarity with the document and recognizing the document's authenticity. Moreover, the 2005 SPD was referenced extensively in plaintiff's complaint (*see* Compl. ¶¶ 49–59), even though no copy was appended. This constitutes good cause sufficient to warrant consideration of the 2005 SPD by this Court. *Cf. Krizek v. CIGNA Group Ins.,* 345 F.3d 91, 97 (2d Cir.2003) (holding that a district court may expand its review of an administrative decision beyond the record in front of the claims administrator for "good cause").

Plaintiff does raise the question of whether there are multiple versions of the 2005 SPD. (Pl. Mot. to Strike ¶ 4.) He argues that he received three partial versions of the 2005 SPD at various points during the pendency of his benefits claim. (*Id.*) He further contends that each version had a cover page that was slightly different from the others. (*Id.*) Although he does not opine on the substantive

differences between the various versions of the 2005 SPD that might exist, this Court will expect defendants to produce at trial any and all versions of the 2005 SPD that were distributed to Verizon employees, including complete versions of the three 2005 SPDs that were distributed under the covers produced by Mr. Fershtadt.

The Final Denial Letter is a part of the administrative record, which "consists of all evidence that was before the administrator as of the date of the *final* determination." *Sarosy v. Metropolitan Life Ins. Co.,* No 94 Civ. 5431, 1996 WL 426387, at *8 (S.D.N.Y. July 30, 1996) (emphasis in original). As further explained below, the fact that the determination was issued after this lawsuit was commenced is relevant to the level of deference afforded the plan administrator, not to the scope of the administrative record—especially not where, as here, the letter issued only a few days after the lawsuit was filed and therefore does not run the risk of unfairly surprising or causing prejudice to the plaintiff.

### C. The Standard of Review for an Appeal of a Denial of Benefits

**\*10** ERISA permits an employee denied benefits under an ERISA-governed plan to challenge that denial in federal district court. *See* 29 U.S.C. § 1132(a)(1)(B). Further, while "ERISA does not set out the appropriate standard of review for actions under § 1132(a)(1) (B)," under Supreme Court precedent, a district court must review a denial of plan benefits under a de novo standard of review unless the plan provides to the contrary. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109, 115, 109 S.Ct. 948, 103 L.Ed.2d 80(1989). If a "plan provides to the contrary by granting the administrator or fiduciary discretionary authority to determine eligibility for benefits," the district court must apply an "arbitrary and capricious" standard of review. *Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105, ——, 128 S.Ct. 2343, 2348, 171 L.Ed.2d 299 (2008) (citation, internal quotation marks, and emphasis omitted). Under an arbitrary and capricious standard of review, a court can overturn an administrator's denial of benefits only if it was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 442 (2d Cir.1995).

Historically, there have been several important exceptions to the above presumption in favor of arbitrary and capricious review, including cases where the denial of benefits was not rendered within a certain number of days of the request for review. Specifically, federal regulations implementing ERISA require a plan administrator to decide a disability claim within a specified period of time. *See, e.g.,* 29 C.F.R. § 2560.503–1(i)(3)(i) (providing plan administrator forty-five days from receipt of request for plan review to notify employee of its claim determination); *id.* § 2560.503–1(i)(1)(i) (providing plan administrator with an additional forty-five days if it determines that "special circumstances" require such an extension). Until 2002, ERISA further provided, "If a decision on review is not furnished within [the specified period of time], the claim shall be deemed denied on review." 29 C.F.R. § 2560.503–1(h)(4). "Deemed denied" claims are automatically subject to de novo review. *See Nichols v. The Prudential Ins. Co. of America,* 406 F.3d 98, 109 (2d Cir.2005).

Effective January 1, 2002, § 2560.503–l(h)(4) was superseded by language that currently provides that if a plan fails to follow the above timing requirements, "a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies [in federal district court] on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim." 29 C.F.R. § 2560.503–1(l). Interpreting the post–2002 language, at least one court in this District (in an unpublished disposition) has limited the standard of review presumption established by *Nichols*—that a claim rendered untimely is subject to de novo review—"to those cases where the administrator fails to respond at all, not those cases where the response is tardy." *See, e.g., Morgenthaler v. First Unum Life Ins. Co.,* No. 03 Civ. 5941, 2006 WL 2463656, at *3 (S.D.N.Y. Aug.22, 2006). However, the Second Circuit has expressly reserved the question of whether the *Nichols* presumption of de novo review is still applicable under the post–2002 version of the regulation. *See Krauss v. Oxford Health Plans, Inc.,* 517 F.3d 614, 624 (2d Cir.2008). Moreover, in *Nichols,* the Circuit expressed serious doubts that de novo review would ever be appropriate in a case where the decision was rendered *after* a plaintiff filed suit. 406 F.3d at 109.

**\*11** Here, no one disputes that the administrator was vested with discretion. Plaintiff only asks this Court to apply review the decision de novo, because the administrator denied his eligibility 100 days after he filed his appeal (and five days after he filed this suit). However,

in formulating his request, plaintiff relies upon a pre–2002 version of the law. After 2002, plaintiffs are not automatically entitled to de novo review simply because the denial of benefits was tardy. Rather, as the Second Circuit explained in *Nichols,* what matters is whether there has been "substantial compliance" with the deadlines, which would "forgive[ ] technical noncompliance for purposes of review of a plan administrator's discretionary decision." *Nichols v. Prudential Ins. Co. of America,* 406 F.3d 98 (2d Cir.2005).

Whether it is possible for a defendant to have "substantially complied" with relevant deadlines when the denial issues after litigation has commenced is an issue that has not yet been decided by the Second Circuit. PGI points out that at least one other district court has found substantial compliance where a final denial was rendered after the plaintiff filed suit. *See Kohut v. Hartford Life and Acc. Ins. Co.,* No. 08 Civ. 669, 2008 WL 5246163, at *6 (D.Colo. Dec. 16, 2008) (claim denied 74 days later and two days after plaintiff filed suit). But *Kohut* is factually inapposite. That case, and the precedent on which it relied, addressed situations where the denial of benefits was tardy, but the defendants had engaged in ongoing communications with the claimant during the period of the delay. *See id.,* 2008 WL 5246163 at *6 (citing cases). No one contends that there was any such dialogue in this case.

Further, the Second Circuit has declined to apply the substantial compliance doctrine under facts analogous to those at bar. As Judge Pooler explained in *Nichols,* regardless of the merits of the substantial compliance doctrine—which the Second Circuit has never formally adopted—the doctrine was certainly inapplicable in that case, where, as here, the defendant had failed to acknowledge the appeal by the administrative deadline and failed to render a decision by time the suit was brought. *Nichols,* 406 F.3d at 109.

Applied to the facts at bar, *Nichols* compels the conclusion that the VCRC's final denial of benefits should be subjected to de novo review.

### II. De Novo Review of Plaintiff's Denial of Benefits

The Final Denial Letter sets forth the rate at which plaintiff is currently receiving long-term disability benefits: $10,029 per month, fully taxable, under the terms of the Bell Atlantic Plan. (Final Denial Letter at 3

(VER0004).) The letter explains that this determination was made based upon the plain text of the 2004 SPD, pursuant to which the plaintiff's long-term benefits were to be determined by the plan in which he was enrolled when he became disabled. (*Id.*) Specifically, the letter cites two relevant portions of the 2004 SPD. The first provision governs only the "coverage date," providing that "the LTD coverage date is determined by the date you first become disabled." The second says, "your benefits, however, are based on your annual benefits compensation on the date you become totally disabled (that is, the first date of STD) and the LTD option you chose *during that plan year"* (hereinafter the "LTD Coverage Date Clause"). (*Id.* at 2 (VER0003) (*quoting* 2004 SPD at 8–16, 8–17 (VER1048–49) (emphasis added).) [2]

**\*12** This language is, at best, ambiguous.

"The question of whether the language of a contract is clear or ambiguous is a question of law to be decided by the court." *Compagnie Financiere De Cic Et De l'UNION Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* 232 F.3d 153, 158 (2d Cir.2000). "The court should not find the language ambiguous on the basis of the interpretation urged by one party, where that interpretation would strain the contract language beyond its reasonable and ordinary meaning." *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d Cir.1990) (quotation marks and citation omitted). However, "when the language of a contract is ambiguous and there is relevant extrinsic evidence regarding the actual intent of the parties, an issue of fact is presented for [the fact-finder] to resolve, thereby precluding summary judgment." *Scholastic, Inc. v. Harris,* 259 F.3d 73, 83 (2d Cir.2001).

In this case, the 2004 SPD provides that an employee "may, however, elect coverage under the Verizon LTD Plan (i.e., 50% or 66 2/3%) during *any benefits renewal period"* (hereinafter the "Election Clause"). (2004 SPD at 8–17 (emphasis added).) The Election Clause provides a single limitation on an employee's right to choose (elect) a benefits plan—the election must take place during a benefits renewal period. The clause does not say that employees who are already receiving short-term disability benefits may *not* elect to change their benefits during a renewal period.

PGI argues that the failure to read such a limitation into the Election Clause would violate the canons of contract interpretation because it would render certain other clauses meaningless. (Verizon & PGI Mem. in Opp. to Mot. for Summ. J., at 11 (S.D.N.Y. May 15, 2009).) For example, the same text box that contains the Election Clause also contains a paragraph that states in relevant part:

> Keep in mind that if you choose to continue your LTD benefits under one of those coverage options of the former Bell Atlantic LTD Plan *and you subsequently become totally disabled,* your employment with Verizon will be terminated at the end of the STD period. As a result, you are not eligible to accrue service for pension benefits while you are totally disabled.

(*Id.* (*quoting* 2004 SPD at 8–17).)

PGI opines that since the "date of total disability" is defined in the 2004 SPD as the first date on which a claimant receives short-term disability benefits (*id.* (*citing* 2004 SPD at 8–17)), the paragraph makes clear that "the text that precedes it is directed at participants in the Bell Atlantic Disability Plan who are *not already* 'totally disabled.' " (*Id.* (emphasis in original).) While PGI's arguments are not without some logic, I do not see how Mr. Fershtadt's reading eviscerates this or any other provision of the plan.

Rather, the readings advanced by both parties appear to be plausible, which suggests that the relevant contract language is ambiguous.

**\*13** In this case, the Court finds that there is one critical and ambiguous phrase in the 2004 SPD—that word is "during" as used in the LTD Coverage Date Clause. The clause provides that "the LTD coverage date is determined by the date you first become disabled," and "your benefits ... are based on your annual benefits compensation on ... the first date of STD [ ] and the LTD option you chose *during* that plan year." (2004 SPD at 8–17 (VER1049).) It is undisputed that plaintiff "chose" (elected) to participate in the 66 2/3% Verizon Plan "during" the year 2004—he made his election to switch plans during that year. Of course, that election

did not go into effect until January 1, 2005, but 2005 is the first year in which plaintiff began collecting long-term disability benefits—not the year in which he "chose" to be covered by the 66 2/3% Verizon Plan. It is not unambiguously clear that plaintiff's long-term disability rate is determined as of the date he begins collection short-term disability benefits. Plaintiff literally chose the Verizon Plan as his long-term disability benefits plan *during* the plan year that encompassed the first date of his short-term disability benefits. Under the plain language of the 2004 SPD, plaintiff appears to have validly elected to participate in the Verizon Plan. The fact that Verizon both solicited a new election from plaintiff (who was already receiving short-term disability benefits) and then confirmed his enrollment in the Verizon Plan on several occasions, constitutes extrinsic evidence suggesting that the 2004 SPD is not without ambiguity.

PGI's interpretation of the LTD Coverage Date Clause is perfectly reasonable—it makes little sense to allow someone who is already disabled, someone who already anticipated collecting long-term disability benefits, to opt into a more generous plan at that point. And as PGI has explained, at least one clause in the SPD suggests that the option to elect a new long-term disability benefits plan was available only to individuals who were not already receiving short-term disability benefits.

But of course, it is all a function of the language, and the language is unclear. Accordingly, the question of the interpretation of "during" in the LTD Coverage Date Clause presents a triable issue of fact. Plaintiff's motion for summary judgment is denied. At trial, both sides can introduce evidence to support their respective constructions of the plan language—which means that PGI can introduce evidence of how this clause has been interpreted in other situations.

**III. No "Extraordinary Circumstances" Justify Estoppel**

Plaintiff argues that PGI is estopped from contesting his right to receive benefits under the Verizon Plan, because he validly elected that plan, paid premiums thereunder and representatives of Verizon confirmed his coverage election numerous times. (PL's Mem. in Supp. of Mot. for Summary Judgment, at 12–16 (S.D.N.Y. Mar. 16, 2009).) However, the case law makes clear that estoppel is unavailable on the facts at hand.

**\*14** Promissory or equitable estoppel is available on ERISA claims only in "extraordinary circumstances." *Devlin v. Transp. Commc'ns Int'l Union,* 173 F.3d 94, 101 (2d Cir.1999) (internal quotation marks omitted); *see Bonovich v. Knights of Columbus,* 146 F.3d 57, 62 (2d Cir.1998); *Shonholz v. Long Island Jewish Med. Ctr.,* 87 F.3d 72, 78 (2d Cir.1996); *Lee v. Burkhart,* 991 F.2d 1004, 1009 (2d Cir.1993). To prevail on an estoppel claim under ERISA, plaintiff must prove "(1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, and (4) an injustice if the promise is not enforced," and must "adduce [ ] ... facts sufficient to [satisfy an] 'extraordinary circumstances' requirement as well." *Aramony v. United Way Replacement Benefit Plan,* 191 F.3d 140, 151 (2d Cir.1999) (internal quotation marks omitted) (alterations in original).

Here, it is not clear that plaintiff has suffered an injury in reliance upon Verizon's representations regarding his long-term disability benefits coverage, since it is undisputed that amounts he paid for enrollment in the Verizon Plan have been refunded. But even if plaintiff was injured, this case simply does not present the kind of "extraordinary circumstances" sufficient to warrant application of estoppel.

The Second Circuit has limited application of the doctrine to circumstances where a defendant induced an irrevocable action on the part of a claimant. For example, in *Shonholz v. Long Island Jewish Med. Ctr.,* the defendants promised severance benefits in order to induce the plaintiff to retire and then reneged once she resigned. *See Devlin,* 173 F.3d at 102 (discussing *Shonholz* ). Applying the *Shonholz* principle in *Devlin,* the Second Circuit refused to expand its application, instead explaining that the mere fact that some employees considered the promised medical benefits in timing their retirements, without more, was insufficient to constitute "extraordinary circumstances" sufficient to warrant application of estoppel. *Id.*

Plaintiff urges this Court to find "extraordinary circumstances" based upon the acuteness of his disability and the fact that defendants provided conflicting information about which plan governed his disability benefits. (Pl.'s Mem. in Supp. of Mot. for Summ. J., at 16 (S.D.N.Y. Mar. 16, 2009).) However, the nature and extent of his disability are not relevant to a determination of whether defendants actions have given rise to "extraordinary circumstances," and reliance is already an element of an estoppel claim—thus, the fact that plaintiff received conflicting information and relied upon it is not, in and of itself, sufficient to constitute "extraordinary circumstances."

Moreover, Mr. Fershtadt's situation is wholly distinguishable from the "extraordinary circumstances" in *Schonholz.* There, defendants intentionally tricked plaintiff into retiring by promising certain "guaranteed" plan benefits, which vanished as soon as she retired. Although the concept of "extraordinary circumstances" has since been expanded through the case law, inducement (even if not intentional) is still prerequisite to a finding of "extraordinary circumstances." *See Arnold v. Storz,* No. 00 Civ. 4485, 2005 WL 2436207, at \*7 (E.D.N.Y. Sept. 30, 2005) (collecting cases). Mr. Fershtadt does not allege that he was induced (intentionally or otherwise) to exit the workforce based upon misrepresentations in disability benefits offered by Verizon. And he has been collecting benefits all along. Assuming PGI is right, and Mr. Fershtadt could not elect to participate in a new plan after he began collecting short-term disability benefits, the only harm he could have suffered was the loss of $492.32 as paid to join the new plan. These premiums have already been refunded to him (with interest). While unfortunate, if defendants made an error in plaintiff's case by soliciting him to change plans when he was ineligible to do so, plaintiff did nothing that qualifies as "reliance to his detriment"—either he was contractually entitled to make the change (in which case he will win the lawsuit) or he was not (in which case he suffered no harm). These circumstances are not "extraordinary" in the sense that is required before estoppel may be invoked, and plaintiff's motion for summary judgment is denied on this issue.

### CONCLUSION

**\*15** For the foregoing reasons, the motion for summary judgment filed by MetLife (docket no. 51) is granted; the motions for summary judgment filed by Verizon and PGI (docket no. 57) are granted in part and denied in part; the motion for summary judgment filed by Mr. Fershtadt (docket no. 60) is denied; all motions to strike (docket nos. 84 & 90) are denied. Unum's motion for summary judgment (docket no. 64) will be decided following additional submissions. The Clerk of the Court

is instructed to close the motions at docket no. 51, 57, 60, 84 & 90.

Unum is granted 10 days from the date of this order to submit evidence explaining what it does as an "outside administrative organization," to whom it answers and whether it provides insurance for the plans. Plaintiff will then have 10 days from the date of Unum's submission to show cause why summary judgment should not be granted in Unum's favor on the ground that Unum is not a proper party to this lawsuit. There will be *no* extensions allowed.

The parties are advised that we will proceed to litigate one narrow issue: the meaning of the language previously identified as ambiguous. That is the *only* issue for trial, and the parties are directed *not* to attempt to raise any other issues (including additional claims) as they are not properly before this Court.

PGI (the plan and sole remaining party) *must* come forward with competent evidence at trial supporting its assertion that the Bell Atlantic Plan pursuant to which Mr. Fershtadt received benefits was consolidated with the Verizon Plan for Group Insurance and was therefore governed by the terms of the 2004 SPD. This will most likely require PGI to identify the plan number corresponding Mr. Fershtadt's Bell Atlantic Plan, since the Plan for Group Insurance documentation explicitly identifies the plan numbers of certain Bell Atlantic plans that were consolidated under its umbrella.

This constitutes the decision and order of this Court.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 571818

Footnotes

1   The Court recognizes that the motion papers were filed principally by Verizon and were joined by PGI and Unum. However, since this Court has dismissed the suit as against Verizon, the motions to strike and for summary judgment will be referred to as "PGI's motion to strike" and "PGI's motion for summary judgment," and the arguments propounded by Verizon will be attributed to PGI, which adopted them.

2   The parties agree that the relevant language governing whether plaintiff could have validly elected a different long-term disability plan after he was already receiving short-term disability benefits is identical in all material ways in the 2004 and 2005 SPDs. Therefore, to the extent that there is a dispute regarding the applicable SPD, it is irrelevant to a determination of whether plaintiff was eligible to elect a new benefits level in October 2004, when he purported to do so.

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 3230435
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Cornelius MARTIN, II, Plaintiff,
v.
The NIAGARA COUNTY JAIL, et al,, Defendants.

No. 05–CV–868(JTC).
|
Aug. 6, 2012.

**Attorneys and Law Firms**

Cornelius Martin, II, pro se.

Webster Szanyi, LLP (Charles E. Graney, Esq. and Mark C. Davis, Esq., of Counsel), Buffalo, NY, for Defendants Niagara County Jail, Beilein, Mahar, Drehs, and Woock.

Roach, Brown, McCarthy & Gruber, P.C. (Joel J. Java, Jr., Esq., of Counsel), Buffalo, NY, for Defendants Hohensee, Aikin, and Inter–Community Memorial Hospital.

JOHN T. CURTIN, District Judge.

### INTRODUCTION

**\*1** Plaintiff brought this action pursuant to 42 U.S.C. § 1983 seeking compensatory and punitive damages for the alleged deliberate indifference to his serious medical needs and the deprivation of medical care. Currently pending before the court are the defendants' motions for summary judgment (Items 59, 60) and plaintiff's cross-motion for summary judgment on liability (Item 62).

### BACKGROUND

Plaintiff commenced this action on December 12, 2005 with the filing of a *pro se* complaint pursuant to Title 42 U.S.C. § 1983 (Item 1). He filed an amended complaint on March 30, 2006 (Item 6). Plaintiff seeks injunctive relief and compensatory and punitive damages for the alleged deliberate indifference to his medical needs in violation

of his rights under the Eighth Amendment to the United States Constitution.

Answers to the amended complaint were filed on November 13, 2006, by defendants Mahar, Drehs, Woock, Niagara County Jail, and Beilein ("the County defendants") (Item 18), and on November 15, 2006 by defendants Hohensee, Aikin, and Inter–Community Memorial Hospital ("the medical defendants") (Item 22). Plaintiff's deposition was taken on September 4, 2008. Following the deposition, the parties stipulated to the following: 1) plaintiff agreed to withdraw his claims against the defendants based on excessive dust, regarding his treatment for sinus problems, and arising from his lack of a mattress and pillow for 12 hours; 2) plaintiff agreed to withdraw his claims against defendants Drehs and Woock individually; 3) all issues regarding plaintiff's CPAP machine were resolved; and 4) plaintiff acknowledged that his claim that he did not receive an inmate handbook did not constitute a violation of the Eighth Amendment (Item 53).

Pursuant to a case management order and following the parties' exchange of discovery materials, on August 27, 2009, the medical defendants moved for summary judgment pursuant to Fed.R.Civ.P. 56 (Item 59). On August 28, 2009, the County defendants filed a motion for summary judgment (Item 60). Defendants assert the following grounds for summary judgment: 1) the plaintiff failed to exhaust his administrative remedies in accordance with the Prison Litigation Reform Act of 1995; 2) Inter–Community Memorial Hospital cannot be held liable on the basis of *respondeat superior;* 3) there was no deliberate indifference to plaintiff's medical needs; 4) defendants are entitled to qualified immunity; and 5) plaintiff's claims against Sheriff Beilein must be dismissed as they are based on a policy that does not exist.

Plaintiff filed his cross-motion for summary judgment on August 31, 2009 (Item 62). He asserted that administrative remedies were unavailable to him as he never received an inmate handbook at the Niagara County Jail. Plaintiff also argued that he suffers from a serious medical need and that the interference by the defendants with his ongoing medical treatment constituted deliberate indifference.

**\*2** On October 30, 2009, defendants filed responses in opposition to plaintiff's motion for summary judgment (Items 66, 67). Plaintiff filed a response to defendant's

motions on November 5, 2009 and agreed to withdraw his claim against Inter–Community Memorial Hospital (Item 68, p. 3). Thereafter, on January 27, 2010, the medical defendants filed a reply (Item 70), and the County defendants filed a reply on January 29, 2010 (Item 71).

The court has determined that oral argument is unnecessary. For the reasons that follow, defendants' motions for summary judgment are granted, and plaintiff's motion for summary judgment is denied.

## FACTS [1]

Plaintiff was incarcerated at the Niagara County Jail ("NCJ") from May 11, 2005 through July 5, 2005, and again from October 7, 2005 until February 3, 2006. At the time he entered the jail, he had been undergoing treatment following multiple spinal surgeries which consisted of physical therapy; two 80 milligram time-released oxycontin pills, one taken at night and one in the morning; and five milligram oxycodone pills to be taken in combination with aspirin or tylenol for breakthrough pain (Item 59, Exh. H, "Martin Dep.," p. 20). Plaintiff stated that while he was not addicted to oxycontin, he was physically "dependent" on the medication. Id., p. 34.

At the time he was booked into the NCJ on May 11, 2005, plaintiff was evaluated by defendant Mahar, a nurse employed by the NCJ. She noted a diagnosis of diabetes and sleep apnea and a prior history of spinal surgery (Item 60, Att. 6, "Mahar Aff.," Exh. A). Nurse Mahar contacted defendant Aikin, the nurse practitioner for the NCJ, who issued a telephone order for plaintiff to be started on the facility's diabetes and detoxification protocols. Id., ¶¶ 14–15. According to the signed standing medical orders of the detox protocol, Nurse Mahar gave plaintiff one tablet of darvocet on the evening of May 11, 2005. Id., ¶ 16.

As a result of being on the detox protocol, plaintiff was housed in an area of the NCJ that he described as "squalor" (Martin Dep., pp. 51, 97). On May 13, 2005, plaintiff asked to be removed from the detox program so that he could be moved to more suitable housing for federal prisoners. Id., p. 98. As a result of being denied oxycontin, plaintiff testified that he suffered sweats, tremors, extremely high blood pressure, diarrhea, and pain in his extremities which lasted about a week to

ten days. Id., p. 41, 42. Other than extremity pain, the withdrawal symptoms plaintiff experienced as a result of the detox protocol have all resolved. Id., p. 47. While housed at the NCJ, plaintiff was also prescribed Ultram for pain, nasal spray for rhinitis, Imodium for diarrhea, and blood pressure medication for hypertension. Id., pp. 44, 54, 106–07.

Prior to his admission to the NJC, plaintiff had not spent a significant amount of time in custody in a New York State jail or prison. He spent 14 days at the Erie County Medical Center awaiting extradition to Ohio in 1995, and approximately one hour in Fredonia awaiting bail in 1990 (Martin Dep., pp. 61–62). He was not familiar with the grievance process and had never filed a grievance. Id., pp. 62–63. Plaintiff stated that he learned of the grievance process in December 2005 or January 2006 by reading the New York State "Minimum Standards" binder in the facility law library. Id., pp. 65, 86.

**\*3** During the intake process, plaintiff signed a form acknowledging receipt of a inmate handbook, although he denies receiving the handbook either time he was processed. Plaintiff stated that he simply signed the acknowledgment because he was told to do so by the admitting officer (Martin Dep., pp. 80, 84–85). He filed a grievance related to his Eighth Amendment claim on January 2, 2006 and pursued the grievance through the appeals process. Id., pp. 71–72.

In support of the motion for summary judgment, defendants submitted an affidavit of Captain Duane Vendetta, grievance coordinator for the Niagara County Sheriff's Department (Item 60, att. 7). The grievance policy in effect at the time plaintiff was incarcerated provided that inmates must complete and submit a grievance form within five days of the act or occurrence giving rise to the grievance. Id., ¶ 9. If the inmate is dissatisfied with the decision of the grievance coordinator, he can appeal to the Chief Administrative Officer of the facility. Id., ¶ 10. After receiving a response from the Chief Administrative Officer, the inmate could seek review of the decision with the Citizen's Policy and Complaint Review Council ("CPCRC") of the New York State Commission of Correction. Id., ¶ 11. Capt. Vendetta stated he reviewed the grievance file for the time period that plaintiff was incarcerated at the NCJ and found no grievances filed by the plaintiff until January 3, 2006 and January 13, 2006. Id., ¶¶ 15–16. Additionally, Capt.

Vendetta stated that it is standard practice for all incoming inmates to receive an inmate handbook that outlines the grievance process. *Id.,* ¶ 24. Even if plaintiff did not receive a handbook, the grievance process is outlined in reference books available in the NCJ law library. *Id.,* ¶ 25. All officers in the housing units are familiar with the grievance process and are instructed to provide grievance forms to any inmate wishing to report a problem. *Id.,* ¶ 26.

In further support of the motion for summary judgment, Dr. James Hohensee stated that at the NCJ, the use of narcotics for pain control is strictly scrutinized (Item 59, att. 17, ¶ 14). In a correctional facility, there is a preference for non-narcotic pain management, if medically possible, but narcotics are prescribed in some cases. *Id.,* ¶ 15. The detoxification protocol at the NCJ in 2005 consisted of a set of standing orders. *Id.,* ¶ 17. The order to place plaintiff on the detox protocol was given by Nurse Practitioner Christopher Aikin and carried out by Rebecca Mahar, a jail nurse. *Id.,* ¶ 18. Thereafter, Dr. Hohensee reviewed plaintiff's chart and countersigned the detox order. *Id.,* ¶ 19. Dr. Hohensee saw plaintiff on June 28, 2005 for a scheduled follow-up visit. Plaintiff complained that the Ultracet he was prescribed was not helping his pain and that he had swelling in his legs. *Id.,* ¶ 22. Dr. Hohensee did not believe narcotics were clinically warranted and chose to add 600 mg. of Motrin to be given three times per day. *Id.,* ¶ 23. On December 2, 2005, Dr. Hohensee saw plaintiff for sinus complaints. *Id.,* ¶ 25. Dr. Hohensee saw plaintiff on December 30, 2006 for complaints of knee pain. He saw no evidence of acute injury and did not feel additional medication was necessary. *Id.,* ¶ 28. Dr. Hohensee saw plaintiff for the last time on January 27, 2006. Plaintiff complained of nosebleeds associated with his use of a CPAP machine. *Id.,* ¶ 27.

**\*4** In his affidavit, Christopher Aikin stated that he practices medicine at the NCJ in collaboration with Dr. Hohensee. As a licensed nurse practitioner, he may examine patients, write prescriptions, and order tests (Item 59, att. 18, ¶ 8). On May 11, plaintiff was booked at the NCJ and was evaluated by Rebecca Mahar, R.N. *Id.,* ¶ 14. At NJC, narcotic medications are strictly regulated, although there is no blanket prohibition against their use when medically necessary. *Id.,* ¶ 17. Mr. Aikin examined plaintiff on May 12, 2005. He confirmed that plaintiff was appropriately on the detox protocol, requested plaintiff's medical records from his neurosurgeon, and determined that narcotic pain

medication was not medically necessary. *Id.,* ¶ 19. On May 13, 2005, plaintiff denied detox symptoms, told Mr. Aikin that he had taken only dose of oxycontin in the last 14 days, and requested to be removed from the detox protocol. *Id.,* ¶ 21. On May 16, 2005, Mr. Aikin ordered Zestril for plaintiff's hypertension. *Id.,* ¶ 23. On May 19, 2005, Mr. Aikin saw plaintiff again, discontinued the Zestril, ordered Imodium for gastrointestinal complaints, and prescribed Ultracet for pain. *Id.,* ¶ 25. On June 3, 2005, Mr. Aikin increased the dosage of Ultracet. *Id.,* ¶ 27. On June 14, 2005, Mr. Aikin saw plaintiff, who complained of constipation. Mr. Aikin ordered magnesium citrate and advised plaintiff to increase his fruit and vegetable intake. *Id.,* ¶ 28. Upon his return to the NCJ in October 2005, plaintiff had lost 75 pounds, no longer needed blood pressure medication, and was taking only Ibuprofen for pain. *Id.,* ¶¶ 31–33. He was seen by Mr. Aikin on October 12, 2005 for treatment of a sebaceous cyst and for sinus problems. *Id.,* ¶ 34. He was seen again on November 15, 2005 for sinus complaints, at which time Mr. Aikin prescribed a different allergy medication. *Id.,* ¶ 35. On December 16, 2006, plaintiff was seen by Mr. Aikin, complaining of knee pain. Mr. Aikin tested the knee for ligament tears and ordered x-rays. *Id.,* ¶ 38. The last time Mr. Aikin saw the plaintiff was on January 6, 2006 for a follow-up visit regarding his knee. The x-ray was negative for fracture but indicated osteoarthritis. *Id.,* ¶ 41. During plaintiff's second incarceration, he never presented in sick call for complaints related to neck or back pain. *Id.,* ¶ 42.

Dr. Paul Adler reviewed plaintiff's records from the NCJ, the Federal Bureau of Prisons, and the Northeast Ohio Correctional Center, the amended complaint, plaintiff's responses to interrogatories, and his deposition testimony. He stated that "it is well within the standard of care for nurse practitioners to see and treat patients with the plaintiff's medical issues both in and out of a correctional setting." (Adler Aff., ¶ 13). It is also standard practice in the hospital or correctional setting for a nurse to execute a telephone order from a physician or nurse practitioner. *Id.,* ¶ 16. Dr. Adler stated that Mr. Aikin's initial examination of plaintiff on May 12, 2005 was consistent with the standard of care and his order to begin detoxification was "within good medical judgment." *Id.,* ¶ 20. During plaintiff's initial incarceration at NCJ, defendants Aikin and Hohensee evaluated and addressed plaintiff's various medical issues, changing and/or increasing his pain medication as needed. *Id.,* ¶ 33. Additionally, during his subsequent incarceration

at NCJ, plaintiff's complaint regarding knee pain was appropriately evaluated. *Id.,* ¶¶ 43, 47, 49.

**\*5** Dr. Adler stated that detoxification in correctional facilities is a "standard intervention," and the "decision of whether to prescribe narcotic versus non-narcotic pain relief is in the judgment of the prescribing physician." (Adler Aff., ¶ 52). The plaintiff was seen in sick call 14 times during the less-than six months he was housed at the NCJ, and was seen and treated for various reasons, including detoxification, pain, edema, hypertension, diabetes, sleep apnea, rhinitis, and knee pain. *Id.,* ¶ 56. In Dr. Adler's opinion, the medical care rendered to plaintiff by defendants Hohensee and Aikin "reflects not deliberate indifference, but clearly health care that is consistent with the applicable standard of care." *Id.,* ¶ 57.

In her affidavit, defendant Mahar stated that she followed medical orders provided to her by the Chief Medical Officer or the nurse practitioner. She never deviated from these orders and merely dispensed medication that had been prescribed by authorized medical providers (Mahar Aff., ¶¶ 19–20).

Major John T. Saxton, chief administrative officer of the NCJ, stated in an affidavit that the NCJ does not have, nor did it have at any time relevant to this litigation, a blanket prohibition preventing the Chief Medical Officer, Dr. James Hohensee, or Nurse Practitioner Aikin from prescribing narcotic pain medication in appropriate circumstances (Item 60, att. 8, ¶ 6). It is the policy of the NCJ to provide narcotic pain medication "when and if such medication is medically necessary." *Id.,* ¶ 7.

## DISCUSSION

### 1. Summary Judgment Standard

Rule 56 provides that, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Although the language of this Rule has been amended in recent years, the well-settled standards for considering a motion for summary judgment remain unchanged. *See, e.g., Faulkner v. Arista Records LLC,* 797 F.Supp.2d 299, 311 n. 7 (S.D.N.Y.2011). Under those standards, the party seeking summary judgment bears the initial burden of establishing that no genuine issue of material fact exists. *Rockland Exposition, Inc. v. Great American Assur. Co.,* 746 F.Supp.2d 528, 532 (S.D.N.Y.2010), *aff'd,* 445 Fed.Appx. 387 (2d Cir.2011). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law .... " *Id.*

Once the court determines that the moving party has met its burden, the burden shifts to the opposing party to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation marks and citation omitted). The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars showing that a trial was needed ...." *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) (internal quotation marks and citation omitted) (quoted in *Kaminski v. Anderson,* 792 F.Supp.2d 657, 662 (W.D.N.Y.2011)). In considering whether these respective burdens have been met, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004) (internal quotation marks and citation omitted).

**\*6** The court recognizes its duty to "extend extra consideration" to *pro se* plaintiffs and that *"pro se* parties are to be given special latitude on summary judgment motions." *Bennett v. Goord,* 2006 WL 2794421, at \*3 (W.D.N.Y. Aug.1, 2006), *aff'd,* 2008 WL 5083122 (2d Cir.2008) (quoting *Salahuddin v. Coughlin,* 999 F.Supp. 526, 535 (S.D.N.Y.1998)); *see also McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (*pro se* party's pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest"). "Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* 1999 WL 983876, at \*3 (S.D.N.Y. October 28, 1999) (citing cases).

The defendants contend that summary judgment should be granted dismissing the complaint as plaintiff failed to exhaust his administrative remedies in accordance with the grievance procedures in place at the NCJ. Additionally, they argue that plaintiff has not shown deliberate indifference to his medical needs. Plaintiff contends that administrative remedies were unavailable to him as he was unaware of the grievance procedures at the NCJ and was never given an inmate handbook. He also argues that the defendants violated the Eighth Amendment by interfering with his ongoing treatment for pain related to his spinal surgeries, by denying him narcotic pain medication, and by providing medical evaluation and treatment by a registered nurse and nurse practitioner.

### 2. Exhaustion of Administrative Remedies

The Prisoner Litigation Reform Act of 1995 ("PLRA"), mandates exhaustion by prisoners of all administrative remedies before bringing an action regarding prison conditions. *See* 42 U.S.C. § 1997e(a). Specifically, the PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.* The Supreme Court has held that the PLRA's "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Smart v. Goord,* 441 F.Supp.2d 631, 636 (S.D.N.Y.2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). Failure to exhaust is an absolute bar to an inmate's action in federal court; section 1997e(a) "requires exhaustion of available administrative remedies before inmate-plaintiffs may bring their federal claims to court at all." *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001), *overruled on other grounds by Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

In assessing the affirmative defense of non-exhaustion, the Second Circuit employs a three-part inquiry. *See Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). A court must (1) determine whether administrative remedies were in fact "available" to the prisoner; (2) consider whether the defendant has forfeited the affirmative defense of non-exhaustion or is estopped from raising it; and (3) determine whether "special circumstances"

justify the prisoner's failure to comply with administrative procedural requirements. *Id.* "Courts should be careful to look at the applicable set of grievance procedures, whether city, state or federal" in assessing availability. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003).

**\*7** In New York, formal exhaustion for prisoners in county jails requires compliance with the three-step grievance and appeal procedure outlined in the New York State Minimum Standards for Management of County Jails. *See* N.Y. Comp.Codes R. & Regs. tit. 9 ("9 N.Y.C.R.R."), § 7032.1. In this case, the NCJ employed a three-tiered grievance process with review of an inmate's complaint by the grievance coordinator, the Chief Administrative Officer of the facility, and finally the New York State Commission of Correction. Generally, "[a] prisoner has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure." *Hairston v. LaMarche,* 2006 WL 2309592, at *7 (S.D.N.Y. August 10, 2006) (citing cases).

Here, as stated by Capt. Vendetta, there was a grievance procedure in place at the NJC that was available to plaintiff (Item 60, att. 7, ¶ 5). Pursuant to this policy, an inmate must complete and submit a grievance within five days of the act or occurrence giving rise to the grievance. *Id.,* ¶ 9. Capt. Vendetta stated he reviewed the grievance file for the relevant time period and found no formal grievances filed by the plaintiff between May 11 and July 5, 2005, the dates of his initial incarceration at the NCJ. *Id.,* ¶ 16. On January 3, 2006, plaintiff filed a grievance claiming that the NCJ seized oxycontin and oxycodone upon his initial admission to the NJC and that he was unlawfully placed on the detox protocol in May 2005. *Id.,* ¶ 17. Capt. Vendetta stated that this grievance was untimely, as it referenced events that occurred significantly more than five days prior to its filing. Despite the untimeliness, the grievance was processed through the system. *Id.,* ¶ 20.

Plaintiff contends that he did not file a timely grievance because he was unaware of the grievance procedure and was never issued an inmate handbook upon his admission to the NJC. Grievance procedures may be deemed unavailable "where plaintiff is unaware of the grievance procedures or did not understand [them] or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Murrary v. Palmer,* 2010 WL 1235591, at *5 (N.D.N.Y. March 31, 2010); *Hargrove*

*v. Riley,* 2007 WL 389003, at *8 (E.D.N.Y. January 31, 2007). Here, there is no dispute that plaintiff had not spent a significant amount of time in custody in New York State. While he signed an intake form acknowledging his receipt of an inmate handbook on both of his admissions to the NCJ, plaintiff stated that he signed the form without reading it and because he was told to do so by the admitting officer. He was unaware of the grievance policies and procedures until approximately December 2005, when he read the grievance policy in the law library. Construing the facts in the light most favorable to plaintiff, he has raised a material fact as to whether a similarly situated person would have been unaware of the grievance process, rendering it unavailable. *See Brown v. Fischer,* 2010 WL 5797359 (N.D.N.Y. December 8, 2010) (failure to exhaust administrative remedies was excusable where inmate was unaware of the grievance procedures and there was no evidence he received an inmate handbook). Accordingly, the defendants' motions for summary judgment based on the plaintiff's failure to exhaust administrative remedies are denied.

### 3. Constitutional Claims

**\*8** Even excusing plaintiff's failure to exhaust his administrative remedies, the complaint must nonetheless be dismissed as plaintiff has failed to establish a violation of the Eighth Amendment.

Title 42 U.S.C. § 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983. "In order to maintain a section 1983 action, two essential elements must be present: (1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct

complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994); *see also Kasiem v. Guzman,* 2011 WL 4352387, at *3 (W.D.N.Y. September 16, 2011).

"The Eighth Amendment's prohibition against cruel and unusual punishment has been construed to include the denial of adequate medical care for an inmate's serious medical needs." *Woods v. Goord,* 2002 WL 31296325, *2 (S.D.N.Y. October 10, 2002); *see also Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The care provided to prisoners to treat their injuries or illnesses must meet minimum medical standards of adequacy and be reasonably intended to satisfy their medical needs. To show that prison medical treatment was so inadequate as to amount to "cruel or unusual punishment" prohibited by the Eighth Amendment, plaintiff must prove that defendants' actions or omissions amounted to "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. at 106; *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000).

Under 42 U.S.C. § 1983, every claim for deliberate indifference to a serious medical need must pass a two-pronged test consisting of objective and subjective elements. First, the court must determine whether, objectively speaking, plaintiff's condition is such that the alleged deprivation of medical assistance is "sufficiently serious." *Woods,* 2002 WL 31296325, at *3 (citing *Hathaway v. Coughlin,* 37 F.3d 63, 66–67 (2d Cir.1994)); *see also Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Second, the court must consider whether the official " 'knew that an inmate faced a substantial risk of serious harm, and disregarded that risk by failing to take reasonable measures to abate it.' " *Woods* 2002 WL 31296325 at *3 (internal cites and alterations omitted); *Harrison v. Barkley,* 219 F.3d at 137.

A serious medical need is one with some urgency or one which, if ignored, may produce death, degeneration, or extreme pain. *Hathaway,* 37 F.3d at 66. As the Second Circuit held in *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003), there is no precise metric to guide the court in its estimation of the seriousness of a prisoner's medical condition. Any inquiry into the objective component of an Eighth Amendment claim must be tailored to the specific

facts of each case. *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003). In *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998), the court set forth a non-exhaustive list of factors that are relevant to the inquiry whether a given medical condition is serious. These factors include: (1) whether a reasonable doctor or patient would perceive the medical need in question as "important and worthy of comment or treatment;" (2) whether the medical condition significantly affects daily activities; and (3) "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

**\*9** Plaintiff's medical conditions included pain as a result of previous spinal surgeries, edema from a blood pressure medication, and knee pain. He acknowledges that the defendants adequately responded to his complaints of allergic rhinitis and sleep apnea. Edema and knee pain are not sufficiently serious to cause death, degeneration, or extreme pain. Accordingly, the plaintiff's only medical conditions that are arguably "serious" relate to plaintiff's pain resulting from his previous spinal surgeries.

Even if the court were to assume that plaintiff's pain as a result of multiple spinal surgeries constituted a serious medical need, there is no evidence of defendants' deliberate indifference to that medical need. Plaintiff's Eighth Amendment claim is based on his assumption that there is a policy against the prescription of any and all narcotic pain medications in the NCJ. He complains that defendant Mahar ordered the detox protocol and that Major Saxton, the Chief Administrative Officer of the NCJ, implemented a policy of no narcotic pain medication. Plaintiff offers no proof to support these factual assumptions. In contrast, the defendants have established that there is no blanket prohibition against the prescription of narcotic medications and that Nurse Mahar initiated the detox protocol upon the order of Nurse Practitioner Aikin.

Plaintiff also complains that he was not seen by Dr. Hohensee until June 28, 2005, 48 days after his arrival at the NCJ. He argues that given his serious medical need, he should have been seen by a physician earlier. "A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference." *Sonds v. St. Barnabas Hosp. Corr. Health Serv.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001); *see also Chance,* 143 F.3d 698 at 703; *McCloud v. Delaney,* 677 F.Supp. 230, 232 (S.D.N.Y.1988) ("[T]here is no right to the medical

treatment of one's choice if the prescribed treatment is based on applicable medical standards."). Additionally, "[m]ere delay in the rendering of medical treatment in and of itself does not rise to the level of a constitutional violation." *Smith v. Montefiore Med. Ctr.-Health Serv. Div.,* 22 F.Supp.2d 275, 280 (S.D.N.Y.1998). "Nor does the fact that an inmate might prefer an alternative treatment, or feels that he did not get the level of medical attention he preferred." *Sonds,* 151 F.Supp.2d at 311; *see also Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). "To demonstrate a constitutional violation, a plaintiff must show that he sustained substantial harm because of the delay in the rendering of medical treatment." *Smith,* 22 F.Supp.2d at 280. "As long as the medical care is adequate, there is no Eighth Amendment violation." *Sonds,* 151 F.Supp.2d at 311; *see also Wandell v. Koenigsmann,* 2000 WL 1036030, \*3 (S.D.N.Y. July 27, 2000) ("So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.").

**\*10** Additionally, plaintiff contends that the medical staff of the NCJ improperly interfered with his treatment by his personal physician by discontinuing his use of oxycontin and oxycodone and placing him on the detox protocol. Plaintiff's assertion that he should have been given narcotic pain medication is likewise a disagreement over the course of treatment. "[M]ere disagreement over the proper treatment does not create a constitutional claim." *Chance,* 143 F.3d at 703. Although plaintiff claims that the defendants ignored and overruled the treatment plan in place when he entered NCJ, an inmate is not entitled to the treatment of his choice. *Id.* at 702. Plaintiff's demand for narcotic pain medications and defendants' unwillingness to prescribe them does not create an Eighth Amendment claim. *See Ifill v. Weinstock,* 2012 WL 162405, \*4 (W.D.N.Y. January 19, 2012); *Guarneri v. Wood,* 2011 WL 4592209, at \*13 (N.D.N.Y. September 2, 2011) ("Defendants regularly offered [plaintiff] non-narcotic pain medication ..... [Plaintiff]'s complaints about the type of medication given to him for pain again amounts to a disagreement over treatment, which is insufficient to allege a constitutional violation.").

In this case, plaintiff was seen by a registered nurse on the day of his admission. He was seen by Nurse Practitioner Aikin on May 12, 13, 16, and 19, 2005, June 3 and 14, 2005, October 12, 2005, November 15, 2005, December 16, 2005, and January 6, 2006. He was seen by Dr. Hohensee on

June 28, 2005, December 2, and 30, 2005, and January 27, 2005. He received medication, medical advice, diagnostic x-rays, and followup care with a physician. Even granting plaintiff the benefit of every favorable inference, it cannot be said that this medical care was inadequate or evinces deliberate indifference on the part of the defendants. Based on the foregoing, no reasonable jury could find that the defendants acted with deliberate indifference to plaintiff's medical needs in violation of his rights under the Eighth and Fourteenth Amendments. Accordingly, defendants are entitled to summary judgment as a matter of law dismissing plaintiff's complaint. The court need not address the argument that the defendants are entitled to qualified immunity.

**CONCLUSION**

The defendants' motions for summary judgment (Items 59, 60) are granted and the complaint is dismissed.

Plaintiff's cross motion for summary judgment (Item 62) is denied. The Clerk of the Court is directed to enter judgment in favor of defendants and to close this case.

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a) (3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

**\*11** So Ordered.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3230435

Footnotes

1    This factual statement is taken from the plaintiff's medical and grievance records (Item 59, Exhs. G, J–M), the plaintiff's deposition testimony (Item 59, Exh. H), the affidavits of James Hohensee, M.D., Christopher Aikin, N.P. and Paul Adler, D.O., with exhibits (Item 59, atts. 17–21), and the affidavits of Rebecca Mahar, Duane Vendetta, and John T. Saxton (Item 60, atts. 6–8).

**End of Document**                                          © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Arnett v. Shojaie, C.D.Cal., November 8, 2011

2010 WL 1235591
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

James MURRAY, Plaintiff,
v.
R. PALMER; S. Griffin; M. Terry;
F. Englese; Sergeant Edwards; K.
Bump; and K.H. Smith, Defendants.

No. 9:03-CV-1010 (GTS/GHL).
|
March 31, 2010.

**Attorneys and Law Firms**

James Murray, Malone, NY, pro se.

Bosman Law Office, AJ Bosman, Esq., of Counsel, Rome, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy Mulvey, Esq., James Seaman, Esq., Assistant Attorneys General, of Counsel, Albany, NY, for Defendants.

*DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** The trial in this prisoner civil rights action, filed *pro se* by James Murray ("Plaintiff") pursuant to 42 U.S.C. § 1983, began with an evidentiary hearing before the undersigned on March 1, 2010, regarding the affirmative defense of seven employees of the New York State Department of Correctional Services-R. Palmer, S. Griffin, M. Terry, F. Englese, Sergeant Edwards, K. Bump, and K.H. Smith ("Defendants")-that Plaintiff failed to exhaust his available administrative remedies, as required by the Prison Litigation Reform Act, before filing this action on August 14, 2003. At the hearing, documentary evidence was admitted, and testimony

was taken of Plaintiff as well as Defendants' witnesses (Darin Williams, Sally Reams, and Jeffery Hale), whom Plaintiff was able to cross-examine through *pro bono* trial counsel. At the conclusion of the hearing, the undersigned indicated that a written decision would follow. This is that written decision. For the reasons stated below, Plaintiff's Second Amended Complaint is dismissed because of his failure to exhaust his available administrative remedies.

**I. RELEVANT LEGAL STANDARD**

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." Porter v. Nussle, 534 U.S. 516, 524-25, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." Woodford v. Ngo, 548 U.S. 81, 89, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial review." Woodford, 548 U .S. at 89. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532.

In accordance with the PLRA, the New York State Department of Correctional Services ("DOCS") has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R.

§§ 701.5, 701.6(g), 701.7. [1] *First,* an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence. [2] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

 **\*2** Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar "special" procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

It is important to note that these procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the

time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied. [3] Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can-and must-be appealed to the next level, including CORC, to complete the grievance process. [4] There appears to be a conflict in case law regarding whether the IGRC's nonresponse must be appealed to the superintendent where the plaintiff's grievance was never assigned a grievance number. [5] After carefully reviewing this case law, the Court finds that the weight of authority appears to answer this question in the affirmative. [6] The Court notes that, if the plaintiff adequately describes, in his appeal to the superintendent, the substance of his grievance (or if the plaintiff attaches, to his appeal, a copy of his grievance), it would appear that there is something for the superintendent to review.

It is also important to note that DOCS has a *separate and distinct* administrative appeal process for inmate misbehavior hearings:

A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;

B. For Tier II disciplinary hearings, the appeal is to the facility superintendent pursuant to 7 N.Y.C.R.R. § 253.8; and

C. For Tier I violation hearings, the appeal is to the facility superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

 **\*3** "An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered nongrievable." 7 N.Y.C.R.R. § 701.3(e)(1). Similarly, "an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable." 7 N.Y.C.R.R. § 701.3(e)(2). However, "[t]he policies, rules, and procedures of any program or procedure, including those above, are grievable." 7 N.Y.C.R.R. § 701.3(e)(3); *see also* N.Y. Dep't Corr. Serv. Directive No. 4040 at III.E.

Generally, if a prisoner has failed to follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Porter,* 534 U.S. at 524). However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004), *accord, Ruggiero,* 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

With regard to this third inquiry, the Court notes that, *under certain circumstances,* an inmate may exhaust his administrative remedies by raising his claim during a related *disciplinary proceeding. Giano v. Goord,* 380 F.3d 670, 678-79 (2d Cir.2004); *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004).[7] However, in essence, the circumstances in question include instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing,[8] *and* (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim.[9] Some district courts have found the first requirement not present where (a) there was nothing objectively confusing about the DOCS regulations governing the grievability of his claim,[10] (b) the inmate was specifically informed that the claim in question was grievable,[11] (c) the inmate separately

pursued the proper grievance process by filing a grievance with the IGRC,[12] (d) by initially alleging that he did appeal his claim to CORC (albeit without proof), the inmate has indicated that, during the time in question, he understood the correct procedure for exhaustion,[13] and/or (e) before and after the incident in question, the inmate pursued similar claims through filing a grievance with the IGRC.[14] Other district courts have found the second requirement not present where (a) the inmate's mention of his claim during the disciplinary hearing was so insubstantial that prison officials did not subsequently investigate that claim,[15] and/or (b) the inmate did not appeal his disciplinary hearing conviction.[16]

**\*4** Finally, two points bear mentioning regarding exhaustion. First, given that non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner failed to exhaust his available administrative remedies. *See, e.g., Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *\*4 (S.D.N.Y. July 25, 2008).* However, once a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then "counter" Defendants' assertion by showing exhaustion, unavailability, estoppel, or "special circumstances."[17]

Second, the Court recognizes that there is case law from within the Second Circuit supporting the view that the exhaustion issue is one of fact, which should be determined by a jury, rather than by the Court.[18] However, there is also case law from within the Second Circuit supporting the view that the exhaustion issue is one of law, which should be determined by the Court, rather than by a jury.[19] After carefully reviewing the case law, the Court finds that the latter case law-which includes cases from the Second Circuit and this District-outweighs the former case law.[20] (The Court notes that the latter case law includes cases from the Second Circuit and this District.)[21] More importantly, the Court finds that the latter cases are better reasoned than are the former cases. In particular, the Court relies on the reasons articulated by the Second Circuit in 1999: "Where administrative remedies are created by statute or regulation affecting the governance of prisons, ... the answer depends on the meaning of the relevant statute or regulation." *Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). The Court relies also

on the several reasons articulated by Judge Richard A. Posner in a recent Seventh Circuit decision: most notably, the fact that the exhaustion-of-administrative-remedies inquiry does not address the merits of, or deadlines governing, the plaintiff's claim but an issue of "judicial traffic control" (i.e., what forum a dispute is to be resolved in), which is never an issue for a jury but always an issue for a judge. *See Pavey v. Conley,* 544 F.3d 739, 740-42 (7th Cir.2008) (en banc), *cert. denied,* --- U.S. ----, 129 S.Ct. 1620, 173 L.Ed.2d 995 (2009). The Court notes that the First, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits appear to agree with the ultimate conclusion of the Second and Seventh Circuits that the exhaustion issue is properly decided by a judge, not a jury. [22]

## II. ANALYSIS

As an initial matter, Plaintiff argues that he exhausted his administrative remedies regarding the claims at issue in this action, by filing a grievance regarding those claims, and then appealing the non-response to that grievance all the way to CORC. Because the Court rejects this argument based on the evidence adduced at the hearing, the Court proceeds to an analysis of the three-step exhaustion inquiry established by the Second Circuit.

### A. Availability of Administrative Remedies

**\*5** New York prison inmates are subject to an Inmate Grievance Program established by DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at \*4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003), and *Snider v. Melindez,* 199 F.3d 108, 112-13 [2d Cir.1999] ). There are different circumstances under which the grievance procedure is deemed not to have been available to an inmate plaintiff. *Hemphill,* 380 F.3d at 687-88. For example, courts have found unavailability "where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove v. Riley,* 04-CV-4587, 2007 WL 389003, at \*8 (E.D.N.Y. Jan.31, 2007) (internal citations omitted). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would]

have deemed them available." *Hemphill,* 380F.3d at 688 (quotations and citations omitted); *see Hargrove,* 2007 WL 389003, at \*8.

Here, after carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that administrative remedies were "available" to Plaintiff during the time in question. The Court makes this finding for the following four reasons.

First, in his sworn Complaint (which has the force and effect of an affidavit), Plaintiff stated, "Yes," in response to the question, "Is there a prisoner grievance procedure at this facility ." (Dkt. No. 1, ¶ 4.a.) [23] Second, both Darin Williams (the corrections officer in charge of the special housing unit during the relevant time period) and Sally Reams (the Inmate grievance program supervisor during the relevant time period) testified credibly, at the exhaustion hearing, that there was a working grievance program at Great Meadow Correctional Facility during the time in question. (Hearing Tr. at 10, 12, 14-21, 40-54.) Third, Plaintiff testified, at the exhaustion hearing that, during this approximate time period (the August to November of 2000), he filed at least three other grievances Great Meadow Correctional Facility, to which he received responses from the inmate grievance clerk, the Superintendent, and CORC. (*Id.* at 154, 157-58, 169-70; *see also* Hearing Exs. D-4, D-5, P-8, P-13, P-14.) [24] Fourth, the Court finds the relevant portions of Plaintiff's hearing testimony regarding the grievance at issue in this action to be incredible due to various omissions and inconsistencies in that testimony, and his demeanor during the hearing. (*Id.* at 127-34.) [25]

### B. Estoppel

After carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that Defendants did not forfeit the affirmative defense of non-exhaustion by failing to raise or preserve it, or by taking actions that inhibited Plaintiff's exhaustion of remedies. For example, Defendants' Answer timely asserted this affirmative defense. (Dkt. No. 35, ¶ 17.) Moreover, Plaintiff failed to offer any credible evidence at the hearing that *Defendant* s in any way interfered with Plaintiff's ability to file grievances during the time in question. (Hearing Tr. at 127-34, 157-58, 169-70.) Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to

exhaust administrative remedies based on the actions (or inactions) of other individuals. [26]

### C. Special Circumstances

**\*6** There are a variety of special circumstances that may excuse a prisoner's failure to exhaust his available administrative remedies, including (but not limited to) the following:

(1) The facility's "failure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance appeal process unavailable to him." *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendants are estopped from relying on the exhaustion defense, as well as "special circumstances" excusing plaintiff's failure to exhaust");

(2) Other individuals' "threats [to the plaintiff] of physical retaliation and reasonable misinterpretation of the statutory requirements of the appeals process." *Clarke v. Thornton,* 515 F.Supp.2d 435, 439 (S.D.N.Y.2007) (noting also that "[a] correctional facility's failure to make forms or administrative opinions "available" to the prisoner does not relieve the inmate from this burden."); and

(3) When plaintiff tries "to exhaust prison grievance procedures[, and] although each of his efforts, alone, may not have fully complied, together his efforts sufficiently informed prison officials of his grievance and led to a thorough investigation of the grievance." *Hairston v. LaMarche,* 05-CV-6642, 2006 WL 2309592, at *8 (S.D.N.Y. Aug.10, 2006).

After carefully considering the issue, the Court finds that there exists, in this action, no "special circumstances" justifying Plaintiff's failure to comply with the administrative procedural requirements. Construed with the utmost of special leniency, Plaintiff's hearing testimony, and his counsel's cross-examination of Defendants' witnesses, raise the specter of two excuses for not having exhausted his available administrative remedies before he (allegedly) mailed his Complaint in

this action on August 14, 2003:(1) that exhaustion was not possible because of the administrative procedures that DOCS has implemented regarding inmate grievances; and/or (2) that an unspecified number of unidentified corrections officers (who are not Defendants in this action) somehow interfered with the delivery of his grievance and appeals. For example, Plaintiff testified at the exhaustion hearing that he handed his grievance and appeals to various corrections officers making rounds where he was being housed, and that, if his grievance and/or appeals were never received, it must have been because his letters were not properly delivered. (Hearing Tr. at 126-36.)

With regard to these excuses, the Court finds that, while these excuses could constitute special circumstances justifying an inmate's failure to exhaust his available administrative remedies in certain situations, [27] these excuses are not available to Plaintiff in the current action because, as stated in Part II.A. of this Decision and Order, the credible testimony before the Court indicates that Plaintiff did not hand his grievance and appeals to various corrections officers with regard to the claims in question. *See, supra,* Part II.A. of this Decision and Order. [28]

**\*7** For all these reasons, the Court finds that Plaintiff's proffered excuse does not constitute a special circumstance justifying his failure to exhaust his available administrative remedies before filing this action.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 10) is **_DISMISSED_** **in its entirety without prejudice** for failure to exhaust his available administrative remedies before filing this action, pursuant to the PLRA; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment for Defendants and close the file in this action.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 1235591

Footnotes

1  *See also White v. The State of New York,* 00-CV-3434, 2002 U . S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

2  The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

3  *Groves v. Knight,* 05-CV-0183, Decision and Order at 3 (N.D.N.Y. filed Aug. 4, 2009) (Suddaby, J.).

4  7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g* ., DOCS Directive 4040 dated 8/22/03, ¶ VI.G. ("Absent [a time limit extension granted by the grievant], matters not decided within the time limits may be appealed to the next step."); *Pacheco v. Drown,* 06-CV-0020, 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan.11, 2010) (Suddaby, J.) ("It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process."), *accord, Torres v. Caron,* 08-CV-0416, 2009 WL 5216956, at *5 & n. 28 (N.D.N.Y. Dec.30, 2009) (Mordue, C.J.), *Benitez v. Hamm,* 04-CV-1159, 2009 WL 3486379, at *13 & n. 34 (N.D.N.Y. Oct.21, 2009) (Mordue, C.J.), *Ross v. Wood,* 05-CV-1112, 2009 WL 3199539, at *11 & n. 34 (N.D.N.Y. Sept.30, 2009) (Scullin, J.), *Sheils v. Brannen,* 05-CV-0135, 2008 WL 4371776, at *6 & n. 24 (N.D.N.Y. Sept.18, 2008) (Kahn, J.), *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *15 & n. 46 (N.D.N.Y. June 20, 2008) (Hurd, J.), *McCloud v. Tureglio,* 07-CV-0650, 2008 WL 17772305, at *10 & n. 25 (N.D.N.Y. Apr. 15, 2008) (Mordue, C.J.), *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *14 & n. 114 (N.D.N.Y. Nov.5, 2007) (McAvoy, J.); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.); *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *11 & n. 66 (N.D.N.Y. June 22, 2006) (McAvoy, J.) ("[A]n inmate's mere attempt to file a grievance (which is subsequently lost or destroyed by a prison official) is not, in and of itself, a reasonable effort to exhaust his administrative remedies since the inmate may still appeal the loss or destruction of that grievance."); *Walters v. Carpenter,* 02-CV-0664, 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004) ("[M]atters not decided within the prescribed time limits must be appealed to the next level of review."); *Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him.").

5  *Compare Johnson v. Tedford,* 04-CV-0632, 616 F.Supp.2d 321, 326 (N.D.N.Y.2007) (Sharpe, J.) ("[W]hen a prisoner asserts a grievance to which there is no response, *and it is not recorded or assigned a grievance number,* administrative remedies may be completely exhausted, as there is nothing on record for the next administrative level to review.") [emphasis in original, and citations omitted] *with Waters v. Schneider,* 01-CV-5217, 2002 WL 727025, at *2 (S.D.N.Y. Apr.23, 2002) (finding that, in order to exhaust his available administrative remedies, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to his grievance, of which no record existed).

6  *See, e.g., Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *16, 18 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (finding that, in order to exhaust his available administrative remedies with regard to his grievance of August 30, 2000, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to that grievance, which included a failure to acknowledge the receipt of the grievance and assign it a number); *Midalgo v. Bass,* 03-CV-1128, 2006 WL 2795332, at *7 (N.D.N.Y. Sept.26, 2006) (Mordue, C.J., adopting Report-Recommendation of Treece, M.J.) (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance of April 26, 2003, which was never assigned a grievance number); *Collins v. Cunningham,* 06-CV-0420, 2009 WL 2163214, at *3, 6 (W.D.N.Y. July 20, 2009) (rejecting plaintiff's argument that his administrative remedies were not available to him where his grievance of March 20, 2004, was not assigned a grievance number); *Veloz v. New York,* 339 F.Supp.2d 505, 515-16 (S.D.N.Y.2004) (rejecting inmate's argument that the prison's grievance procedure had been rendered unavailable to him by the practice of prison officials' losing or destroying his grievances, because, *inter alia,* "there was no evidence whatsoever that any of [plaintiff's] grievances were filed with a grievance clerk," and he should have "appeal[ed] these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming"); *cf. Hernandez v. Coffey,* 582 F.3d 303, 305, 309, n. 3 (2d Cir.2009) ("Our ruling in no way suggests that we agree with Hernandez's arguments regarding exhaustion or justification for failure to exhaust [which included an argument that the Inmate Grievance Program was not available to him because, when

he filed a grievance at the first stage of the Program, he received no response and his grievance was not assigned a grievance number].").

7    The Court recognizes that the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), may have changed the law regarding possible exceptions to the exhaustion requirement (and thus the possibility that exhaustion might occur during the disciplinary process). Specifically, in *Woodford,* the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Woodford,* 548 U.S. at 93. "Proper" exhaustion means that the inmate must complete the administrative review process *in accordance with the applicable procedural rules,* as a prerequisite to bringing suit in federal court. *Id.* at 88–103 (emphasis added). It is unclear whether *Woodford* has overruled any decisions that recognize "exceptions" to the exhaustion requirement. Out of special solicitude to Plaintiff, the Court will assume that *Woodford* has not overruled the Second Circuit's *Giano–Testman* line of cases.

8    *Giano,* 380 F.3d at 678 ("[W]hile Giano was required to exhaust available administrative remedies before filing suit, his failure to do so was justified by his reasonable belief that DOCS regulations foreclosed such recourse."); *Testman,* 380 F.3d at 696–98 (remanding case so that district court could consider, *inter alia,* whether prisoner was justified in believing that his complaints in the disciplinary appeal procedurally exhausted his administrative remedies because the prison's remedial system was confusing).

9    *Testman,* 380 F.3d at 696–98 (remanding case so that district court could consider, *inter alia.* whether prisoner's submissions in the disciplinary appeals process exhausted his remedies "in a substantive sense" by "afford[ing] corrections officials time and opportunity to address complaints internally"); *Chavis v. Goord,* 00-CV-1418, 2007 WL 2903950, at \*9 (N.D.N.Y. Oct.1, 2007) (Kahn, J.) ("[T]o be considered proper, exhaustion must occur in both a substantive sense, meaning that prison officials are somehow placed on notice of an inmate's complaint, and procedurally, in that it must be presented within the framework of some established procedure that would permit both investigation and, if appropriate, remediation.") [citation omitted]. The Court joins the above-described two requirements in the conjunctive because the Second Circuit has recognized that mere notice to prison officials through informal channels, without more, does not suffice to satisfy the PLRA procedural exhaustion requirement. *See Macias v. Zenk,* No. 04-6131, 495 F.3d 37, at \*43-44 (2d Cir.2007) (recognizing that *Woodford v. Ngo,* 548 U.S. 81 [2006], overruled *Braham v. Casey,* 425 F.3d 177 [2d Cir.2005], to the extent that *Braham* held that "informal complaints" would suffice to exhaust a claim).

10    *See, e.g., Reynoso v. Swezey,* 423 F.Supp.2d 73, 75 (W.D.N.Y.2006), *aff'd,* 238 F. App'x 660 (2d Cir.2007) (unpublished order), *cert. denied,* 552 U.S. 1207, 128 S.Ct. 1278, 170 L.Ed.2d 109 (2008); *Holland v. James,* 05-CV-5346, 2009 WL 691946, at \*3 (S.D.N.Y. March 6, 2009); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at \*10 (S.D.N.Y. May 30, 2008); *cf. Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at \*5 & n. 23 (N.D.N.Y. July 11, 2007) (McAvoy, J.) (reciting this point of law in context of failure to appeal grievance determination to CORC).

11    *See, e.g., Johnson v. Barney,* 04-CV-10204, 2007 WL 2597666, at \*2 (S.D.N.Y. Aug.30, 2007); *Reynoso,* 423 F.Supp.2d at 75-76.

12    *See, e.g., Reynoso,* 423 F.Supp.2d at 75 ("There is no evidence that plaintiff was confused or misled about the proper method for raising his claims. In fact, the record shows exactly the opposite: plaintiff did file a grievance about the incident. He simply failed to appeal the denial of that grievance to CORC."); *Tapp v. Kitchen,* 02-CV-6658, 2004 WL 2403827, at \*9 (W.D.N.Y. Oct.26, 2004) ("In the instant case, however, plaintiff does not and cannot claim to have believed that his only available remedy was to raise his complaint as part of his disciplinary hearing, since he also filed a grievance with the Inspector General, and also claims to have filed both an inmate grievance and a separate complaint with the facility superintendent."); *cf. Muniz,* 2007 WL 2027912, at \*5 & n. 23 ("Plaintiff's Complaint alleges facts indicating that he believed it necessary to file a grievance with the Gouverneur C.F. IGRC and to appeal the denial of that grievance to the Gouverneur C.F. Superintendent. Why would he not also believe it necessary to take the next step in the exhaustion process and appeal the Superintendent's decision to CORC?").

13    *See, e.g., Petrusch v. Oliloushi,* 03-CV-6369, 2005 WL 2420352, at \*5 (W.D.N.Y. Sept.30, 2005) ("[A]s to his grievance, which is the subject of this lawsuit, plaintiff does not appear to be contending that he believed the Superintendent's denial constituted exhaustion, since by initially claiming that he did appeal to CORC, albeit without proof, he has demonstrated his knowledge of the correct procedure for exhaustion.").

14    *See, e.g., Benjamin v. Comm'r N.Y. State DOCS,* 02-CV-1703, 2007 WL 2319126, at \*14 (S.D.N.Y. Aug.10, 2007) ("Benjamin cannot claim that he believed that appealing his disciplinary proceeding was the only available remedy at his disposal in light of the numerous grievances he has filed during his incarceration at Green Haven [both before and after the incident in question].") *vacated in part on other grounds,* No. 07-3845, 293 F. App'x 69 (2d Cir.2008).

15    *See, e.g., Chavis,* 2007 WL 2903950, at *9 ("The focus of a disciplinary hearing is upon the conduct of the inmate, and not that of prison officials.... While the mention of a constitutional claim during plaintiff's disciplinary hearing could potentially have satisfied his substantive exhaustion requirement by virtue of his having notified prison officials of the nature of his claims, he did not fulfill his procedural exhaustion requirement [under the circumstances due to his] ... mere utterance of his claims during the course of a disciplinary hearing .... [T]here is nothing in the record to suggest that when the issues of interference with plaintiff's religious free exercise rights or alleged retaliation for having voiced his concerns were in any way investigated by prison officials.") [citations omitted].

16    *See, e.g., Colon v. Furlani,* 07-CV-6022, 2008 WL 5000521, at *2 (W.D.N.Y. Nov.19, 2008) ("Colon was found guilty of harassment based on a letter that he wrote to defendant Bordinaro, concerning some of the events giving rise to his failure-to-protect claim, but it does not appear that he appealed that disposition.... While under some circumstances an inmate may be able to satisfy the exhaustion requirement by appealing from a disciplinary hearing decision ..., plaintiff did not do so here, and this claim is therefore barred under the PLRA.") [citations omitted]; *Cassano v. Powers,* 02-CV-6639, 2005 WL 1926013, at *5 (W.D.N.Y. Aug.10, 2005) ("[E]ven assuming plaintiff believed that his proper recourse was to raise [his] complaint at his disciplinary hearing, rather than using the Inmate Grievance Program, he did not exhaust that process. That is, plaintiff has not provided any evidence that he appealed his Tier III hearing conviction. Since plaintiff did not pursue even the disciplinary appeal process, he can not have made submissions in the disciplinary process that were sufficient, in a substantive sense, to exhaust his remedies under § 1997e(a).") [internal quotation marks and citation omitted].

17    *See Hemphill,* 380 F.3d at 686 (describing the three-part inquiry appropriate in cases where a prisoner plaintiff plausibly seeks to "counter" defendants' contention that the prisoner failed to exhaust his available administrative remedies under the PLRA); *Verley v. Wright,* 02-CV-1182, 2007 WL 2822199, at *8 (S.D.N.Y. Sept.27, 2007) ("[P]laintiff has failed to demonstrate that the administrative remedies were not, in fact, 'actually available to him.' "); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (finding that the plaintiff "failed to meet his burden under *Hemphill* of demonstrating 'special circumstances' "); *see also Ramirez v. Martinez,* 04-CV-1034, 2009 WL 2496647, at *4 (M.D.Pa. Aug.14, 2009) ("In order to effectively oppose defendants' exhaustion argument, the plaintiff has to make a showing in regard to each of his claims."); *Washington v. Proffit,* 04-CV-0671, 2005 WL 1176587, at *1 (W.D.Va. May 17, 2005) ("[I]t is plaintiff's duty, at an evidentiary hearing, "to establish by a preponderance of the evidence that he had exhausted his administrative remedies or that any defendant had hindered or prevented him from doing so within the period fixed by the Jail's procedures for filing a grievance.").

18    *See, e.g., Lunney v. Brureton,* 04-CV-2438, 2007 WL 1544629, at *10 n. 4 (S.D.N.Y. May 29, 2007) ("There is certainly case law that supports the view that exhaustion should be determined by the Court rather than by a jury. As the Supreme Court has recently affirmed, however, exhaustion is an 'affirmative defense,' much like a statute of limitations defense. Where there are disputed factual questions regarding an affirmative defense such as a statute of limitations defense, the Second Circuit has stated that 'issues of fact as to the application of that defense must be submitted to a jury.' Thus, it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court."); *Finch v. Servello,* 06-CV-1448, 2008 WL 4527758, at *8 n. 5 (N.D.N.Y. Sept.29, 2008) (McAvoy, J.) (citing *Lunney* and noting that "it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court").

19    *See, e.g., Harrison v. Goord,* 07-CV-1806, 2009 WL 1605770, at *7 n. 7 (S.D.N.Y. June 9, 2009) (recognizing that "[t]here is authority ... for the position that where questions of fact exist as to whether a plaintiff has exhausted administrative remedies, such fact questions are for the Court, rather than a jury, to decide ...."); *Amador v. Superintend. of Dept. of Corr. Servs.,* 03-CV-0650, 2007 WL 4326747, at *5 n. 7 (S.D.N.Y. Dec.4, 2007) ("It is unclear whether factual disputes regarding the exhaustion defense should ultimately be decided by the court or by a jury.... [T]here is ... case law ... supporting the view that exhaustion should be determined by the court and not a jury."), *appeal pending,* No. 08-2079-pr (2d Cir. argued July 15, 2009).

20    *See, e.g., Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438 (E.D.N.Y.2009) (noting that the magistrate judge held an evidentiary hearing "on the issue of exhaustion"); *Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *3 n. 2 (S.D.N.Y. July 25, 2008) (finding that "the better approach is for the judge, and not the jury, to decide any contested issues of fact relating to the defense of failure to exhaust administrative remedies."); *Amador,* 2007 WL 4326747, at *5 n. 7 ("[T]here is ... case law, which in my view is more persuasive and on point, supporting the view that exhaustion should be determined by the court and not a jury. I find it proper that this issue be decided by the court."); *Enigwe v. Zenk,* 03-CV-0854, 2006 WL 2654985, at *4 (E.D.N.Y. Sept.15, 2006) (finding that, at the summary judgment "stage of the proceedings, a genuine question of fact exists with respect to whether [plaintiff] should be excused from exhausting his administrative remedies with regard to claims relating to his confinement at MDC Brooklyn," and therefore "direct[ing] that a hearing

be held" before a judge, to resolve this issue); *Dukes v. S.H.U. C.O. John Doe # 1,* 03-CV-4639, 2006 WL 1628487, at *6 (S.D.N.Y. June 12, 2006) (ordering an "evidentiary hearing [before a judge] on the issue of whether prison officials failed to assign grievance numbers to [plaintiff's] grievances and, if so, whether that rendered further administrative remedies unavailable, estopped the Defendants from asserting non-exhaustion, or justified [plaintiff's] failure to appeal to the CORC"); *Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) ("The Court could have *sua sponte* dismiss[ed] this action as the record is unmistakeably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA.... In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear."); *Roland v. Murphy,* 289 F.Supp.2d 321, 323 (E.D.N.Y.2003) "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.") [internal quotation marks and citation omitted]; *Evans v. Jonathan,* 253 F.Supp.2d 505, 509 (W.D.N.Y.2003) ( "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.").

21 *See, e.g., Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999) ("Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They either are, or inevitably contain, questions of law. Where administrative remedies are created by statute or regulation affecting the governance of prisons, the existence of the administrative remedy is purely a question of law. The answer depends on the meaning of the relevant statute or regulation."), *accord, Mojias v. Johnson,* 351 F.3d 606, 608-11 (2d Cir.2003) (citing relevant language from *Snider v. Melindez,* and later stating that a district court could *sua sponte* dismiss a prisoner's civil rights complaint for failure to exhaust his available administrative remedies if it gave him notice and an opportunity to be heard); *DeBlasio v. Moriarty,* 05-CV-1143, Minute Entry (N.D.N.Y. filed Dec. 9, 2008) (McCurn, J.) (indicating that judge held pre-trial evidentiary hearing on whether plaintiff had exhausted administrative remedies before filing action); *Pierre v. County of Broome,* 05-CV-0332, 2007 WL 625978, at *1 n. 1 (N.D.N.Y. Feb.23, 2007) (McAvoy, J.) (noting that "[t]he court held an evidentiary hearing on October 25, 2006 concerning the issue of whether Plaintiff had exhausted administrative remedies"); *Hill v. Chanalor,* 419 F.Supp.2d 255, 257-59 (N.D.N.Y. March 8, 2006) (Kahn, J.) (*sua sponte* dismissing a prisoner's civil rights complaint, pretrial, for failure to exhaust his available administrative remedies after it gave him notice and an opportunity to be heard); *Raines v. Pickman,* 103 F.Supp.2d 552, 555 (N.D.N.Y.2000) (Mordue, J.) ("[I]n order for the Court to dismiss for failing to exhaust administrative remedies, the Court must be shown that such a remedy exists for an inmate beating in the grievance context. This is an issue of law for the Court to determine.").

22 *See Casanova v. Dubois,* 289 F.3d 142, 147 (1st Cir.2002); *Hill v. Smith,* 186 F. App'x 271, 273-74 (3d Cir.2006); *Mitchell v. Horn,* 318 F.3d 523, 529 (3d Cir.2003); *Anderson v. XYZ Corr. Health Servs., Inc.,* 407 F.3d 674, 682-83 (4th Cir.2005); *Dillon v. Rogers,* No. 08-30419, 2010 WL 378306, at *7 (5th Cir. Feb. 4, 2010); *Taylor v. U.S.,* 161 F. App'x 483, 486 (6th Cir.2005); *Larkins v. Wilkinson,* 172 F.3d 48, at *1 (6th Cir.1998); *Husley v. Belken,* 57 F. App'x 281, 281 (8th Cir.2003); *Ponder v. Wackenhut Corr. Corp.,* 23 F. App'x 631, 631-32 (8th Cir.2002); *Wyatt v. Terhune,* 315 F.3d 1108, 1119-20 (9th Cir.2003), *cert. denied,* 540 U.S. 810 (2003); *Freeman v. Watkins,* 479 F.3d 1257, 1260 (10th Cir.2007); *Alloway v. Ward,* 188 F. App'x 663, 666 (6th Cir.2006); *Bryant v. Rich,* 530 F.3d 1368, 1373-76 (11th Cir.), *cert. denied,* --- U.S. ----, 129 S.Ct. 733, 172 L.Ed.2d 734 (2008).

23 The Court notes that, in his Complaint, Plaintiff also swore that his "grievance was denied." (Dkt. No. 1, ¶ 4.b.ii.) However, during the exhaustion hearing, Plaintiff testified that he never received a response to his grievance from any member of DOCS.

24 In addition, the documentary evidence adduced at the hearing establishes that, in actuality, Plaintiff filed ten other grievances during this time period (and several appeals from the denials of those grievances). The first of these grievances (Grievance Number GM-30651-00), filed on August 25, 2000, regarded Plaintiff's request for medications. (Hearing Exs. D-4, D-5.) The second of these grievances (Grievance Number GM-30691-00), filed on September 1, 2000, regarded Plaintiff's request for copies. (Hearing Ex. D-4.) The third of these grievances (Grievance Number GM-30729-00), filed on September 11, 2000, regarded the use of full restraints against Plaintiff. (*Id.; see also* Hearing Ex. P-14.) The fourth of these grievances, filed on October 19, 2000 (Grievance Number GM-30901-00), regarded Plaintiff's request for the repair of his cell sink. (Hearing Exs. D-4, D-5.) The fifth of these grievances (Grievance Number GM-30901-00), also filed on October 19, 2000, regarded Plaintiff's request for the clean up of his cell. (Hearing Ex. D-4.) The sixth of these grievances (Grievance Number GM-31040-00), filed on November 17, 2000, regarded the review of records. (*Id.*) The seventh of these grievances (Grievance Number GM-31041-00), also filed on November 17, 2000, regarded Plaintiff's request for medical attention. (*Id.;* see also Hearing Ex. P-13) The eighth of these grievances (Grievance Number GM-31048-00), filed on November 20, 2000, regarded the rotation of books. (Hearing Ex. D-14) The ninth of these grievances (Grievance

Number GM-31040-00), filed on November 27, 2000, regarded the review of records (and was consolidated with his earlier grievance on the same subject). (*Id.*) The tenth of these grievances (Grievance Number GM-31070-00), filed on November 27, 2000, regarded Plaintiff's eyeglasses. (*Id.*)

25 For example, Plaintiff was unable to identify the corrections officers to whom he handed his grievance and appeals for mailing. (*Id.* at 127-34.) Moreover, Plaintiff did not convincingly explain why the grievance and appeals at issue in this action did not make it through the mailing process, while his numerous other grievances and appeals did make it through the mailing process. (*Id.* at 154-171.) In addition, Plaintiff acknowledged that it was his belief, during this time period, that an inmate was not required to exhaust his administrative remedies in matters involving the use of excessive force; yet, according to Plaintiff, he decided to exhaust his administrative remedies on his excessive force claim anyway. (*Id.* at 148-49.)

26 *See Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006) (holding that defendants were not estopped from asserting the affirmative defense of non-exhaustion where the conduct plaintiff alleged kept him from filing a grievance-that he was not given the manual on how to grieve-was not attributable to the defendants and plaintiff "point[ed] to no affirmative act by prison officials that would have prevented him from pursuing administrative remedies"); *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *19 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) ("I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.") [emphasis in original]; *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *16 (N.D.N.Y. Nov.5, 2007) (McAvoy, J. adopting Report-Recommendation of Lowe, M.J.) (finding defendants not estopped from raising Plaintiff's non-exhaustion as a defense based on plaintiff's allegation "that [he] was inhibited (through non-responsiveness) by [ ] unnamed officials at Coxsackie C.F.'s Inmate Grievance Program (or perhaps the Grievance Review Committee), and Coxsackie C.F. Deputy Superintendent of Security Graham" because plaintiff's complaint and "opposition papers ... fail to contain any evidence placing blame on Defendants for the (alleged) failure to address his grievances and complaint letters"); *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *16 (N.D.N.Y. Apr.24, 2006) (Hurd, J. adopting Report-Recommendation of Lowe, M.J.) (finding that defendants are not estopped from relying on the defense of non-exhaustion because "no evidence (or even an argument) exists that any Defendant ... inhibit[ed] Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter."); *cf. Warren v. Purcell,* 03-CV-8736, 2004 WL 1970642, at *6 (S.D.N.Y. Sept.3, 2004) (finding that conflicting statements [offered by a non-party]-that the prisoner needed to refile [his grievance] and that the prisoner should await the results of DOCS's investigation-estopped the defendants from relying on the defense on non-exhaustion, or "[a]lternatively, ... provided ... a 'special circumstance' under which the plaintiff's failure to pursue the appellate procedures specified in the IGP was amply justified."); *Brown v. Koenigsmann,* 01-CV-10013, 2005 WL 1925649, at *1-2 (S.D.N.Y. Aug.10, 2005) ("Plaintiff does not assert that Dr. Koeingsmann personally was responsible for [the failure of anyone from the Inmate Grievance Program to address plaintiff's appeal. [However,] *Ziemba [v. Wezner,* 366 F.3d 161 (2d Cir.2004) ] does not require a showing that Dr. Koenigsmann is personally responsible for plaintiff's failure to complete exhaustion [in order for Dr. Koenigsmann to be estopped from asserting the affirmative defense of failure to exhaust administrative remedies], as long as someone employed by DOCS is. If that reading of Ziemba is incorrect, however, ... then the circumstances here must be regarded as special, and as justifying the incompleteness of exhaustion, since a decision by CORC is hardly something plaintiff could have accomplished on his own.").

27 *See, e.g., Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "refusal to accept or forward plaintiff's appeals ... effectively render[s] the grievance appeal process unavailable to him").

28 The Court notes that, even if Plaintiff did (as he testified) hand to a corrections officer for mailing a letter to the Superintendent on September 13, 2000, appealing from the IGRC's failure to decide his grievance of August 22, 2000, within nine working days (i.e., by September 5, 2000), it appears that such an appeal would have been filed two days too late under DOCS Directive 4040, which requires that appeal to be filed within four working days of the IGRC's failure to decide his grievance (i.e., by September 11, 2000). (*See* Hearing Tr. 127-34; Hearing Ex. P-1, at 5-7 [attaching ¶¶ V.A, V.B. of DOCS Directive 4040, dated 6/8/98].)